CLARKE ET AL. *v.* LACY

[No. 228, October Term, 1956.]

484

*Decided June 4, 1957.*

The cause was argued before COLLINS, HENDERSON, HAM-MOND and PRESCOTT, JJ., and McLAUGHLIN, J., Associate Judge of the Fourth Judicial Circuit, specially assigned.

*John D. Gilmore, Jr.,* with whom were *Conroy, Williams, Nylen & Gilmore, M. J. Cuff* and *John F. Lillard, Sr.,* on the brief, for appellants.

*Theodore L. Miazga,* with whom was *Matilda M. Miazga* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

To be determined in this appeal is the validity of the contention of Phillips Clarke and Mae Clarke, his sister, appellants, that they still have contract rights to develop, and share in, certain land of Mary Lacy, appellee. The chancellor decided that under the terms of the contract their rights had expired with the passage of time and dismissed their bill seeking declarations of their claimed rights and an injunction against transfer of the land.

Mary Meidel, the mother of Mary Lacy, owned some thirty or forty acres close to the Anacostia River and the District of Columbia line. She died in 1946 and the property passed under her will to Mrs. Lacy. Some years ago, in the process of the building of the Baltimore-Washington Parkway, the heart of the property was taken by condemnation. Some six acres were left on the southeast side of the parkway, with all access denied. The parties refer to this tract as parcel B. The remainder of the property, containing some eighteen acres, is on the southwest side of the parkway and is called parcel A. It was stipulated that Mrs. Lacy now has, and at all times here material had, "good merchantable record title" to parcel B and to some twelve acres, duly described, of parcel A, acquired under the will of her mother, as well as that Mrs. Lacy now has, and at all times here material had, "possessory title" to the remainder of parcel A, and that this remainder had "been held adversely, openly, notoriously, hostilely, and continuously" by her mother, from January 2, 1896, to the date of her death, and by Mary Lacy since the date of her mother's death to the present, against the whole world, but that said possessory title has not been established as a matter of record in the Circuit Court for Prince George's County, Maryland, and that "no one has ever asserted a claim against said possessory title."

In the spring of 1953, the Clarkes approached Mrs. Lacy to arrange for the development of the land into a commercial or industrial center. The Clarkes were experienced in the

development of raw land, largely in the building of houses, and had had some experience and considerable familiarity with commercial or industrial development. After various discussions, the parties superseded two previously executed informal plans of development by a final contract dated July 20, 1953. The contract was intended to cover any land owned by Mrs. Lacy in the area and, for this reason, the acreage mentioned in the contract is thirty acres because Mrs. Lacy thought she had additional land not a part of parcels A and B. This belief proved erroneous so that the contract really relates to those parcels. Under the terms of the contract, the Clarkes agreed to pay real estate taxes for 1953 and to proceed with studies looking to the development of the land for commercial or industrial use. The land was zoned residential so this contemplated rezoning. When it was feasible to do so, the Clarkes agreed to attempt to procure (a) a tenant for each of one or more sites who would lease a site and a building to be erected for not less than five years, (b) the builder who would erect the building, (c) a loan commitment sufficient to pay all or most of the construction costs, as well as to find sufficient additional funds for the construction of the building. When the Clarkes had provided for the construction, financing and occupancy of a site or unit in the new project, Mrs. Lacy was to convey to them an undivided one-half interest in that site. If any part, or all, of the land were condemned by or sold to public authority, the Clarkes were to get half of the amount received in excess of $3,000 an acre. Paragraph 6 of the contract gave the Clarkes one year from its date to produce a tenant and otherwise comply with the contract requirements as to the construction and financing of the first unit. If they did not provide a tenant within a year, the contract was at an end; if they did, the contract was to continue for an additional five years for the development of the rest of the property. Paragraph 7 provided that the one year period of paragraph 6 would not begin to run until the rezoning of all or part of the tract had been approved. Paragraph 10 provided that the Clarkes, at their expense, would have the title to parcels A and B searched and "should such title be found to be defec-

tive", that Mrs. Lacy at her expense would "immediately institute appropriate proceedings to remove the cloud upon her title". It was further provided that "the one-year limitation referred to in paragraph 6 above shall not commence to run until said cloud has been removed." Paragraph 11 states that should Mrs. Lacy's title "to all or any part of said land be found to be defective and that such cloud may not be removed by legal or other means within 12 months after discovery thereof," the Clarkes have the option to terminate the agreement.

As soon as the contract was executed, the Clarkes paid the taxes they had agreed to pay and sought rezoning of parcel A. To help in the procuring of the rezoning and the layout of and planning for the tracts, the Clarkes employed one Fred Tuemmler, a former employee of the Park and Planning Commission, who is engaged in private practice as a land planning expert. It is stipulated that they expended $12,000, most of which went for his services. Rezoning of the property to light industrial was approved on June 16, 1954. The Clarkes attempted to procure a railroad siding to the property but to do this it was necessary to cross land owned by the Park and Planning Commission, and permission could not be secured. The original one year limitation of the contract would have expired on July 20, 1954, but since it was enlarged by the contract to one year from rezoning, the Clarkes had until June 16, 1955, to find a tenant for a first unit. They found no tenant within the time limit. Mrs. Lacy contends that for this reason all rights and obligations on both sides terminated on June 16, 1955, and that the Clarkes have no interest in or claim to the property. On the other hand, the Clarkes contend that the contract has not expired according to its terms. Their contention is based on two grounds: first, that Mrs. Lacy does not have good title to approximately one-third of parcel A, so that her title to a part of the land is "defective" within the meaning of the contract, and the one year limitation is stretched to one year from the time she shall have removed the cloud on her title; and second, that time was not of the essence of the contract and because of the extensive efforts and substantial expense

to which they went (a) to develop or attempt to develop the property (which increased its value), (b) to sell parts of it to a public body, and (c) to trade portions of it to a public body in exchange for other lands more suitable for immediate development, they should not be held to a firm date for compliance with the undertaking to lease an industrial unit.

The Clarkes admit that before they signed the first of the contracts they had been told, and by their investigations verified, that Mrs. Lacy had only possessory title to a substantial part of parcel A. The testimony permits the inference that they could have stipulated before the contract was signed exactly what they stipulated at the trial, as to the nature of her title and to the fact that there had been no claims against her possessory interest as to a substantial portion of parcel A, although the exact limits of the land so held would not then have been known. Nevertheless, they argue that Mrs. Lacy's title must be considered defective and to have a cloud on it because banks and other lending institutions will not make loans unless the title can be insured by a title insurance company and that title insurance companies will not insure titles based on adverse possession. They say that since the contract contemplated that loans would be made on the property, the parties must be understood to have intended that the possessory title was a defective title requiring perfecting. The Clarkes contemplated and gave attention to the possessory title, of which they had full knowledge, before they signed the two preliminary contracts and the final contract. In the two preliminary contracts they described the land as "unencumbered". This being so, it is hard to conclude that in the final contract they had a possessory title in mind as "defective" or as a "cloud" in light of the fact that Mrs. Lacy was given twelve months to remove "such cloud" by paragraph 11 of the contract "after discovery thereof". No discovery was required as to the possessory title for the facts were known. The two contracts that preceded the final contract made no mention of possible defects in title or of the perfection of title. The first referred to Mrs. Lacy's holdings as twenty acres, the second, as twenty-two acres. It was because of Mrs. Lacy's thought that she might own additional

land that the final contract specified the area to be thirty acres. It is not unreasonable to suppose that the parties contemplated that in the title to the additional land not included in parcels A and B, there might be a defect which would later be discovered in the course of a title search.

The contract was drawn by counsel for the Clarkes. Mrs. Lacy urges that they and their counsel stood in a fiduciary relationship to her and that advantage was taken of her. The chancellor found no evidence to support this claim and in this we think he was entirely right. Nevertheless, if there were doubt as to the meaning of the contract, it would be interpreted against those who drew it. *Owens v. Graetzel,* 146 Md. 361, 370. We think, however, that there is no doubt as to the meaning of the contract. The terms used have established significance in Maryland. The essential prerequisite to extension of time on the question of title is that Mrs. Lacy's title to all or part of the land involved be defective or have a cloud on it. This is the converse of saying that Mrs. Lacy must have a good or a perfect or an indisputable title, which is to say, a marketable title. 3 *American Law of Property,* Sec. 11.47 says that the phrases "good or perfect title", "first class title" and "indisputable title" all mean a marketable title. One that is defective or has a cloud on it clearly would be one that was not marketable. In the succeeding section, it is pointed out that there is some authority for the proposition that a marketable title means one good of record but that numerous jurisdictions hold that a good title is provable by any competent evidence, including that of adverse possession, and in section 11.49, it is noted that title by adverse possession may be a good or marketable title. Section 15.14 discusses the estate and title acquired by adverse possession and says the title so acquired "* * * is the same as any acquired by grant, descent, or conveyance and can be lost or transferred only by the methods applicable to such titles. The title is good as it stands and the claimant is in no position to compel the record owner to execute a conveyance to him. The only method of making it a record title is by the recording of a judgment or decree determining its existence, but the recording acts are not in form to require

that it be made a matter of record nor to affect it for lack of record." Since 1892, at least, Maryland has granted specific performance of contracts for sale of land, title to which was held by adverse possession, and has considered such titles to be good. In *Lurman v. Hubner*, 75 Md. 268, 272, the Court referred to the fact that there had been continuous adverse possession for some thirty years and said: "We see nothing in the record to show that this title is not perfectly good." See also *Arey v. Baer*, 112 Md. 541, 544; *Potomac Lodge v. Miller*, 118 Md. 405; *Title, Incorporated v. Dubel*, 177 Md. 387; *Taussig v. Van Deusen*, 183 Md. 436. In *Garner v. Union Trust Co.*, 185 Md. 386, 390, it was said: "It is. not every possibility of defect or even threat of contest that will be sufficient to make a title unmarketable, for it may be practically impossible for a vendor to anticipate all imaginable objections which, if they existed, would defeat his title. * * * For instance, equity will decree specific performance of a contract for the sale of land even where the title is based upon adverse possession, if the title is so clearly proved and so free from doubt that it may serve as a proper foundation for a decree against the purchaser." In his opinion below, the chancellor said: "The Court can think of no more complete description of a good adverse title than is contained in this stipulation." We agree. *Taussig v. Van Deusen, supra; Stewart v. Kreuzer*, 127 Md. 1, 9; *Title, Incorporated v. Dubel, supra*, p. 391 of 177 Md. See too *Sinclair v. Weber*, 204 Md. 324. The title expert produced by the Clarkes admitted that, although it was unusual, he had known of instances where title insurance companies had insured titles based on adverse possession. Mr. Clarke testified that he had not been too concerned about the fact that part of the title was possessory only while—as was true for almost two years after the signing of the contract—he was attempting to sell the land to a public or governmental body or to trade the land to such a body for other land, because he knew those bodies would in all probability accept the possessory title at face value.

The Clarkes could easily have provided in the contract, if they had so desired, that Mrs. Lacy's title to all of the land

must be made good of record or that the title must be accept-able to an attorney of their choice or that a named title com-pany or some title company would insure it. Such provisions are not unusual. It is noted in 3 *American Law of Property,* Sec. 11.48, to which we have referred above, in discussing whether a title must be good of record: "However, any ne-cessity for construction is quite generally obviated by an ex-press provision for a record title * * *." In Sec. 11.47, to which we have also referred before, it is said: "A provision that the vendor will tender such a title as a title insurance company will approve and insure imposes an obligation on the vendor to tender an insurable title * * *." Here the ob-ligation that rested on Mrs. Lacy was only to hold a good or marketable title and to perfect any that were not good or marketable. Since our opinion is that the chancellor was cor-rect in deciding that she had a good and marketable title, the Clarkes can predicate no extension of time on the fact that she held a good title by adverse possession to part of her land and took no steps to have a court declare what was a fact.

We turn then to the contention that time was not of the essence and that in equity and good conscience, Mrs. Lacy must permit an extension of the contract to enable the Clarkes to find a tenant or to otherwise share in the value their ex-penditures of time and money have added to the property. The chancellor construed the contract of July 20, 1953, as, in substance and effect, a unilateral contract which the Clarkes purchased. They had no obligations other than to pay certain taxes, and to make efforts to find tenants or to sell to gov-ernmental bodies. They did not covenant that they would find a tenant or procure sales. They were given the option, for a stated period, of producing certain results and if they did produce, their reward was earned. We think that the chancellor's reading of the contract was accurate and that it is to be considered and construed as unilateral and in the nature of an option. *Grabenhorst v. Nicodemus,* 42 Md. 236. In such a case, time is of the essence as a matter of law. *Coleman v. Applegarth,* 68 Md. 21. In *Foard v. Snider,* 205 Md. 435, 446, the subject was considered and it was said: "Time is of the essence in a unilateral contract, such as an

option, both in law and in equity, whether expressly declared to be so or not. *Williston on Contracts,* Rev. Ed., Sec. 853; *Pomeroy, Equity Jurisprudence,* 5th Ed., Vol. 4, Sec. 1408; *Maughlin v. Perry,* 35 Md. 352. Each such agreement must be scrutinized to see what it requires to be done within the specified time, either expressly or by necessary implication. * * * Whatever the option requires must be done. As in the case of all offers, revocable or irrevocable, the exercise must be unconditional and in exact accord with the terms of the option." It is our view that since the Clarkes did not find a tenant for any of Mrs. Lacy's property within a year from the time zoning was approved, all of their rights in the contract ceased.

There is another weakness in the contention of the Clarkes as to an extension of time. If Mrs. Lacy was not required to take any action as to her possessory title, which is our holding, there would be no definite or measurable period to which an extension could apply. Generally, where time is found not to be of the essence, the party in default has it within his power to fulfill, within a definite period, the obligation he should have fulfilled earlier, that is, to make payment, or conveyance, or to execute a lease, or perform some other specific act. Here the Clarkes are asking what amounts to an indefinite extension so that they may have an opportunity to find a tenant or make a sale to a government agency, an opportunity they had for almost two years but were unable to gratify. We think the complications in the situation before us, if the time were to be extended, emphasize the soundness of the chancellor's finding that time was of the essence of the contract.

The Clarkes urge that Mrs. Lacy was fully aware of all the matters which delayed or impeded the securing of tenants during the period from July 20, 1953, to June 16, 1955. These included the rezoning of the property and the attempts to effect a trade of part or all of parcel A to avoid the extinguishment or impairment of the entire development by the threatened condemnation for the Anacostia River flood control project. They say that the attempt to develop parcel A was retarded, if not prohibited, by these threatened govern-

mental takings of all or part of the land, until May of 1955 when they were advised by counsel that it would be futile to continue negotiations. They urge that because the State Roads Commission was threatening to condemn parcel B (as it has since done), its development was impracticable, and that even in the absence of threatened condemnation, its lack of access was a bar and it was necessary to attempt to gain access by grant from a neighboring landowner. The Clarkes say that they could not, "knowing that some unknown portion of the land was to be taken for public purposes, produce a tenant for any portion of the parcel", and that in view of the possibility of a trade of all or part of the tract "it was conceivable and probable at times during the course of these trade negotiations that they would be developing an entirely different tract of land." They complain that Mrs. Lacy, while participating in all of these negotiations, made no demand that they produce a tenant and that within a space of three weeks from the cessation of negotiations with public bodies, notified them that the contract had been terminated. We find nothing in the conduct of Mrs. Lacy that can give any comfort or support to the Clarkes. She was merely keeping abreast of developments that could benefit her and the Clarkes, and hoping, as they hoped, for some consummation of efforts that would produce tangible financial results. They were merely doing what the contract contemplated they would do, keeping her advised as they did so. We see no estoppel or waiver.

*Decree affirmed, with costs.*