MARYLAND CITY REALTY, INC. *v.* VOGTS ET AL.

[No. 210, September Term, 1964.]

*Decided April 6, 1965.*

The cause was argued before Prescott, C. J., and Hammond, Marbury, Sybert and Barnes, JJ.

*Ralph R. Sachs* for the appellant.

*Gerald Kunes* for the appellees.

Barnes, J., delivered the opinion of the Court.

This appeal involves the alleged sale of a lot of approximately one acre at the intersection of Old Annapolis Road and the New Fort Meade Road in the Fourth Election District of Anne Arun-

del County (the property). It has been owned in fee simple since 1954 by Chewisco Franklin Vogts and his wife, Carrie Lee Vogts (the Vogts).

The case arose in the Circuit Court for Anne Arundel County upon the amended bill of complaint of Maryland City Realty, Inc. (Realty Company), for specific performance of an alleged option contract dated December 8, 1962 between the Realty Company and the Vogts to purchase the property for $45,000. In addition to the Vogts as defendants, Nicholas Andrew (Andrew) was joined as a party defendant. Andrew was alleged to have a subsequent contract of sale to purchase the property for $50,000. In addition to specific performance of the December 8 contract, the plaintiff prayed for injunctive relief, for compensatory damages of $100,000, for punitive damages of $100,000 and for other relief. A cross bill of complaint was filed by the Vogts against the Realty Company seeking compensatory damages as well as of $25,000 as punitive damages and for other relief.

After taking the testimony for two days of some fourteen witnesses produced by both the plaintiff and the defendants, the Chancellor, Judge Duckett, dismissed both the amended bill of complaint and cross bill of complaint and required the Realty Company to pay the costs.

Judge Duckett did not file a memorandum opinion in the case. He offered to do this if there was an appeal. Counsel for the plaintiff indicated that a formal written request for the filing of a memorandum opinion would be filed (see Maryland Rule 18 c), but no such formal written request was ever filed. The Chancellor, however, indicated the general basis of certain rulings and of his final conclusion. These will be referred to later in this opinion.

The testimony and exhibits indicate the following:

In 1959 or 1960, Nicholas Andrew, a neighbor and friend of the Vogts, offered to purchase the property from them for $25,000. This offer was refused by Mr. Vogts, who indicated that he did not wish to sell the property at that time. The Realty Company has its office at 701 Washington Boulevard, Laurel, Maryland. The Vogts property is not far from Laurel, Maryland, but is in Anne Arundel County as indicated.

During the afternoon of Saturday, December 8, 1962, Ernest C. Pierce, an agent of the Realty Company, interviewed the Vogts on behalf of his principal to purchase the property. He obtained the signatures of the Vogts to a written option contract (first option contract) which for a recited consideration of $1.00 granted the Realty Company an exclusive option to purchase the property for a period of 60 days from the date of the contract, December 8, 1962, for $50,000. This first option contract was on a typewritten form which was typed prior to its presentation to the Vogts. The typing was apparently not done by a professional typist. The blanks were filled in in ink by Mr. Pierce but no metes and bounds description was set forth in the space provided for the description of the property to be purchased. In paragraph 5 there was a provision that the option might be extended for an additional period of 30 days upon *written* notice by the grantee prior to the end of the first option period, the grantee's check for the further sum of $1.00 to accompany any such notice. Paragraph 6 provided that in the event the option was not exercised by the grantee during "the time or times above stipulated, then it shall have no further right or option to purchase said property and the option consideration shall become the sole property of the grantor." In paragraph 7 it was provided that the grantee should be given possession of the property upon delivery of the deed or 120 days after the date the grantee elected to purchase, whichever occured later. In paragraph 10 it was provided that all notices required or which might be given under the option contract should be considered properly given if delivered in writing personally or sent by certified mail, postage prepaid with a return receipt requested, addressed to the grantor or grantee, as the case might be, at the address first recited in the option contract, and that notice given by mail "shall be deemed given on the date on which such notice is deposited in the United States mail." There is nothing in the first option contract in regard to the payment of any real estate commission to the Realty Company of $5,000 or in any other amount. It is clear that the Vogts were not obligated to pay any real estate commissions.

William D. Miller, President of the Realty Company, was not available on December 8, 1962 so that Mr. Pierce took the

matter up with him the following Monday, December 10. Either on or sometime after December 10, Mr. Pierce on behalf of the Realty Company obtained the signatures of the Vogts to another exclusive option contract for the property (second option contract). This second option contract is upon a mimeographed form quite similar to the form of the first option contract except that it has a form number "B-55" and is on two longer sheets of paper instead of the three somewhat shorter pages of the typewritten form of the first option contract. The mimeographed language is identical with that of the typewritten language except in paragraph 5 in which the notice for the additional option period in the typewritten form must be "written," whereas in the mimeographed form the word "written" is left out. In the blanks in the second option contract, the additional terms were typed in by Mr. Pierce. Instead of the 60 day option given in the first Realty Company option contract, the second option contract provided for 90 days; instead of a $50,000 purchase price a $45,000 purchase price was inserted; and, instead of a 120 day possession period in paragraph 7, a 90 day possession period was inserted. The date inserted by Mr. Pierce was December 8, 1962. This appears in ink, as do the signatures of the Vogts and the signature of Mr. Pierce as the witness to their signatures. A metes and bounds description appears on the back of the first mimeographed page, there being a notation "Legal Property Description on back of page" appearing in the blank left on the first page for the purpose of inserting the description of the property. As already indicated no such notation and no metes and bounds description appear in the first option contract.

No copy of either option contract was left with the Vogts, who at no time prior to their execution had legal or other advice in regard to the contracts. The Vogts are elderly, unsophisticated persons with limited education.

The only explanation Mr. Miller was able to give as to why the Vogts would reduce the $50,000 purchase price to $45,000 was "the people thought they would have to pay a commission and they were willing to sign a second agreement for $45,000 because they wouldn't have to pay a commission." Mr. Miller had already admitted that the Vogts were not obligated

to pay any real estate commission "because I was the purchasing company in this case." When asked whether his Company's salesman, Mr. Pierce, explained to the Vogts that they did not have to pay a commission, Mr. Miller replied, "I believe he did. Not on the first one but on the second one he did." Mr. Pierce, however, when asked "* * * did you explain to them why the price was fixed in the second paper at forty-five thousand dollars?", replied "There again I do not recall." He further stated that he did not remember any discussion with the Vogts on the occasion of his second visit to them.

Mr. Vogts testified that he understood that he was to receive $50,000 and not $45,000. He was willing to settle for $50,000, based on the original representation that this was the purchase price. He testified that he did not receive the $1.00 mentioned in either option contract. This is uncontradicted. There is evidence which would support a finding that the Vogts understood that the only change in the second option contract was in the time of the option and possession periods.

Mr. Vogts also testified that at the time of the negotiation of the first option contract it had been represented to the Vogts that the contract would contain provisions that the Realty Company would move them to a trailer park or put them in an apartment free of charge, and when they got their house built, the Realty Company would pay for the moving van. This evidence was also uncontradicted. There is nothing in either the first or second option contract containing these agreements.

The 90 day option period under the second option contract expired on Friday, March 8, 1963. Mr. Miller testified that on March 7 his salesman, Mr. Pierce, prepared two letters addressed to the Vogts and signed by him as President of the Realty Company. One stated:

"Enclosed please find my check in the amount of one dollar as payment for the thirty day extension of our option agreement dated 8 December, 1962 as stipulated in the agreement."

The other letter stated:

"In reference to our option agreement dated December 8, 1962, and continuing for a period of ninety

days. In accordance with this agreement I desire to exercise my option and purchase your property for the stipulated price of Forty-Five Thousand ($45,-000.00).

"Respecting settlement and conveyance of this property I will be in contact with you in the near future to establish a date and time for said conveyance."

Mr. Miller further testified that he placed a $1.00 check of Realty Company in the extension letter and mailed it to the Vogts, registered mail with a return receipt requested near the noon hour on March 7. Shortly after posting this extension letter, he ordered a cup of coffee at a drugstore but before he drank it, decided to mail the second letter exercising the option. He mailed it right after he mailed the first one by registered mail, with a return receipt requested. The return receipts are numbered 5524 and 5525 respectively and both indicate delivery to Mr. Vogts on March 8, 1963.

Mr. Pierce, who went to the hospital the afternoon of March 7, denied that he prepared the two letters. He testified that he spelled "extension", "e-x-t-e-n-s-i-o-n." Mr. Miller, on the other hand, testified on cross examination that he spelled "extension" "e-x-t-e-n-t-i-o-n", the way it is misspelled in the extension letter. It was pointed out that in the answers to interrogatories filed on behalf of the Realty Company in the case, counsel for the Realty Company had spelled "extension" "e-x-t-e-n-t-i-o-n." There was some confusion in Mr. Vogts' testimony as to what he received on March 8. Originally he stated that he received the extension letter in one envelope and the $1.00 check (dated March 4, 1963) in the other. Later Mr. Vogts seemed to indicate that he had received *two* letters and a check. In any event, Mr. Vogts mailed back all the papers he received on March 8 in a registered letter to the Realty Company on March 11. Judge Duckett ruled that the option was not properly exercised because of the two conflicting letters sent the same day. We are of the opinion that there was sufficient evidence to support his ruling.

We are also of the opinion that the power to extend the option for an additional 30 days (if such an additional option pe-

riod validly existed in view of Mr. Vogts' position that no such additional option period was intended or agreed to by the Vogts) was also not validly exercised by the conflicting letters.

The Realty Company also contended, however, that the Vogts at a later date called for settlement and thereby waived the failure of the Realty Company to exercise its option. The facts in regard to this contention are as follows:

The Vogts, on March 7, 1963, not having heard from the Realty Company in regard to the option contract consulted with Lester Mallonee, an attorney in Laurel, who had been a friend of the Vogts for many years, with a view of preparing a contract of sale for the property to Mr. Andrew for $50,000. Shortly after March 7, Mr. Mallonee prepared the contract of sale which was executed by the Vogts and Mr. Andrew on April 8, 1963. $1000 of the purchase money was paid at that time. The Andrew contract provided that $49,000 balance be paid at the time of settlement which was fixed for June 7, 1963.

On June 6, Mr. Sachs, attorney for the Realty Company, wrote the Vogts advising them of his representation, referring to the option contract of December 8, 1962 and stating that the Realty Company "exercise [sic] the option to purchase in accordance with the terms of the said option grant." Settlement was stated to take place at Mr. Sachs' office on June 12, 1963 at 2:00 P.M. D.S.T. It was further stated that the Realty Company "agrees to waive all of the conditions set forth in the said option grant and will require you to execute a general warranty deed conveying the subject property free and clear." This was sent by certified mail.

After a telephone conference with Mr. Sachs, Mr. Mallonee indicated that settlement with Andrew would not go forward and he would obtain assurance from the Vogts to that effect. Letters dated June 7 were obtained from the Vogts indicating that they would not settle for the property without Mr. Sachs' prior approval, but these were never delivered as the Vogts discharged Mr. Mallonee as their counsel. Mr. Sachs was advised by Mr. Mallonee of the discharge on Saturday, June 8, by telephone, and this was confirmed by letter on June 10.

In the meantime, Charles J. Atas, counsel for Mr. Andrew,

gave the Vogts notice by letter dated June 7, 1963 that they should "not execute any settlement for your property under penalty of a law suit for breach of contract with Mr. Andrew." A copy of this letter was sent to Mr. Mallonee and to Mr. Sachs.

Mr. Sachs had a personal conference with Mr. Vogts at the property. Mr. Vogts advised Mr. Sachs that he had no attorney and that he would not settle on June 12, as requested by Mr. Sachs, because of the Andrew contract. There were discussions about a possible settlement of the matter. Later Mr. Sachs conferred with Mr. Atas about a possible settlement but these negotiations were not successful.

On June 13, the Realty Company filed an action at law in the Circuit Court for Anne Arundel County against the Vogts for alleged breach of contract, claiming $75,000 damages. All of these papers and proceedings made the Vogts extremely nervous. Mrs. Vogts, who had a heart condition, had a heart attack as a result of the excitement.

Also on June 13 Mr. Sachs conferred with Gerald Kunes, an attorney in Laurel, who had been engaged to represent the Vogts. Mr. Andrew had agreed to pay Mr. Kunes any fee incurred in this representation as the Vogts were without funds to pay a fee.

On June 17, Mr. Kunes wrote Mr. Sachs stating that on behalf of the Vogts, and "without waiver of their objections as to the invalidity of the contract of option submitted by Maryland City Realty, Inc., they are prepared to settle the property with your client." The settlement date was required to be prior to June 21, 1963 and if not effected "suit will be filed against your client." June 20 at 11:00 A.M. was set for the day of settlement. There was a conference between Mr. Kunes and Mr. Sachs and an exchange of correspondence.

Mr. Andrew had filed a suit for specific performance against the Vogts on June 19.

Mr. Kunes in his letter of June 19 to Mr. Sachs objected to Mr. Sachs' prior registered letters and statements in them. He objected on behalf of Mr. Vogts to Mr. Sachs coming to the house "and harrassing him and Mrs. Vogts concerning this case." He also stated "Your statement that your client would take title unconditionally is, however, assuring."

It is not necessary to review the meeting on June 20 for settlement. There were charges and counter-charges. Mr. Kunes insisted that the arrangement was that the Realty Company would take title "unconditionally" and notwithstanding the Andrew suit. Mr. Sachs contended to the contrary. No settlement was accomplished.

The following day, June 21, the elaborate original bill of complaint, with 10 exhibits (requiring 27 printed pages in the appellant's appendix) was filed by the Realty Company against the Vogts and Andrew. After answers were filed, the Vogts, on October 14, filed a cross bill of complaint against the Realty Company for the attachment of the $5,000 injunction bond as compensatory damages, a decree for $25,000 punitive damages and for other relief. It was not until October 22, 1963 when the Realty Company filed its answer to the motion of the Vogts to produce documents and the order of the court directing such production of documents, that counsel for the Vogts knew of the existence of the first option contract. Pursuant to leave granted on December 6, the Realty Company filed an amended bill of complaint with the same exhibits as were attached to the original bill of complaint. The amended bill of complaint was almost identical with the original bill of complaint except in paragraph 32 in regard to Andrew and in the prayers for relief.

An order was passed by the lower court on January 2, 1964 consolidating the *Andrew* case (Equity No. 15667) with the pending case (Equity No. 15676). Mr. Andrew filed an answer on January 14, 1964 indicating that on November 14, 1963 Andrew and the Realty Company had executed mutual releases whereby the Realty Company had released Andrew of any claims arising from any interference with contract relations as a result of any contracts between the Realty Company and the Vogts and Andrew and the Vogts.

In the course of the testimony during the second day of trial, counsel for Mr. Andrew filed a petition to dismiss voluntarily the suit of *Andrew v. Vogts,* Equity No. 15667. The Chancellor announced that the bill of complaint in that case was dismissed by the plaintiff's counsel in open court and that the plaintiff would pay the costs.

At the conclusion of the testimony, the Chancellor indicated that he was of the opinion that the Vogts had been imposed upon and that he was going to dismiss the bill of complaint and the cross bill of complaint and allow no damages to anyone, the Realty Company to pay the costs. The final decree of April 14, 1964, from which the appeal is taken, incorporates this ruling by the Chancellor.

The law applicable to this suit is well established by the prior decisions of this Court. Judge Hammond stated for the Court in *Perlmutter v. Bacas*, 219 Md. 406, 411-412; 149 A. 2d 23, 26:

> "A court of equity will decree specific performance almost as a matter of course if the terms of the contract are clear and unobjectionable, and although such relief is addressed to the sound discretion of the court, that discretion is not arbitrary. Where the contract is clearly established, it is the duty of the court to enter the decree. Nevertheless, the discretion of the court will be exercised to deny the relief where to grant it would be to compel the defendant to perform a contract which he did not intend to make or which he would not have entered into had its true effect been understood. 3 Pomeroy, *Equity Jurisprudence*, 5th Ed., Sec. 860; 5 Williston, *Contracts*, Rev. Ed., Sec. 1427; *Somerville v. Coppage*, 101 Md. 519, 523-524; *The Glendale Corp. v. Crawford*, 207 Md. 148, 154; *Clark v. Kirsner*, 196 Md. 52, 56; *Kappelman v. Bowie*, 201 Md. 86, 89-90. * * *

> "Specific performance may be, and has been, refused where the innocent mistake is mutual or that of one side only. *Somerville v. Coppage, supra.* Cases in which innocent misrepresentation as to a material fact was made by the vendor and specific performance was denied, include *Ginther v. Townsend*, 114 Md. 122; *Housing Engineering Co. v. Andrew Co., supra; The Glendale Corp. v. Crawford, supra.* Cases where the mistake was that of the vendee only and relief was denied include *Diffenderffer v. Knoche*, 118 Md. 189,

194-196; *Henneke v. Cooke,* 135 Md. 417; *Kappelman v. Bowie, supra."*

The evidence supports the Chancellor's finding that the Vogts had been imposed upon by the Realty Company. As we have indicated the Vogts are elderly, unsophisticated people, who are unfamiliar with business transactions of the character involved in this case. They had no independent advice in regard to the two option contracts when they were executed by them. They understood that the purchase price for the property was $50,000, as set forth in the first option contract. They erroneously believed that they would have to pay a real estate commission to the Realty Company, which everyone concedes they would not have to pay, as the Realty Company was itself, the prospective purchaser. There was nothing in the first option contract in regard to their payment of any $5,000 commission. Taking advantage of this erroneous belief on their part, the Realty Company apparently, without any prior authorization on the part of the Vogts, inserted $45,000 as the purchase price in the second option contract as well as extending the original option period from 60 to 90 days. No copies of either contract were given to the Vogts and they were never told that they were not obligated for any real estate commission or that the change from $50,000 to $45,000 had been made. Mr. Vogts was under the impression that the contract price was $50,000 and that only the original option period had been extended from 60 to 90 days by the second option contract. In addition to these facts, there were the other representations in regard to placing the Vogts in a trailer or apartment until they had completed the building of their new house and moving them to the new house without charge. None of these agreements is in either the first or second option contract. These facts, in our opinion, clearly justify the Chancellor's finding that the Vogts had been imposed upon and this, in itself, is sufficient to justify the refusal of specific performance.

In any event, there was at least a unilateral mistake by the Vogts in regard to a material matter even making the difficult assumption for the argument only that there was no intentional misrepresentation or deception involved. As indicated in *Perl-*

*mutter v. Bacas, supra,* this would justify the Chancellor's refusal of specific performance and is sufficient to dispose of this appeal. See also *Keppelman v. Bowie,* 201 Md. 86, 93 A. 2d 266.

We have already indicated that, in our opinion, there was sufficient evidence to support the Chancellor's determination that, in fact the option was never effectively exercised by the Realty Company on March 7, 1963. This finding is further supported by the letter of June 6, 1963 from counsel for the Realty Company to the Vogts which purported, *as of that time,* to exercise the option on behalf of the Realty Company.

Time is not generally of the essence in contracts for the sale of real estate unless expressly stated so to be, *Chapman v. Thomas,* 211 Md. 102, 108, 126 A. 2d 579. Time, however, is always of the essence in *option* contracts, because of the nature of the option contract itself, so far as the option provisions of the contract are concerned. *Clarke v. Lacy,* 213 Md. 482, 491-492, 132 A. 2d 478.

After the option has been exercised, then time is not of the essence of the contract of sale unless expressly stated so to be in the contract, or if the contract of sale is ambiguous on this point, time is found to be of the essence from the testimony. *Diamond v. Shriver,* 114 Md. 643, 649, 80 Atl. 217.

The Realty Company, in an effort to avoid the effect of the Chancellor's finding that it did not effectively exercise its option contends that the Vogts have waived or are estopped to assert their prior objections to the second option contract by calling for settlement under it.

It is well settled when a vendor has indicated his intention not to insist on timely or exact performance and the purchaser has changed his position to his injury relying thereon, waiver or estoppel may preclude the vendor from insisting on the time provision. *Lissau v. Smith,* 215 Md. 538, 544, 138 A. 2d 381.

Judge Burke stated for the Court in *Dague v. Grand Lodge,* 111 Md. 95, 103, 73 Atl. 735:

> "Waiver or acquiescence (which is a species of waiver by tacit assent) 'implies the abandonment of some right which can be exercised, or the renounce-

ment of some benefit or advantage which but for such waiver the party relinquishing would have enjoyed.' The general rule is that 'there can be no waiver unless the person against whom the waiver is claimed had full knowledge of his rights and of facts which will enable him to take effectual action for the enforcement of such rights. * * *.' "

See also *Armour Fertilizer Works v. Brown,* 185 Md. 273, 278-279, 44 A. 2d 753.

In regard to equitable estoppel, Judge Prescott said for the Court in *J. F. Johnson Lumber Company v. Magruder,* 218 Md. 440, 447-448, 147 A. 2d 208, 212:

"'The whole doctrine of equitable estoppel is a creature of equity and governed by equitable principles. It was educed to prevent the unconscientious and inequitable assertion of rights or enforcement of claims which might have existed or been enforceable, had not the conduct of a party, including his spoken and written words, his positive acts and his silence or negative omission to do anything, rendered it inequitable and unconscionable to allow the rights or claims to be asserted or enforced."

In our opinion, the Vogts did not waive their objections to the second option contract and were not estopped to raise these objections for the following reasons: 1) There was no knowledge by counsel for the Vogts when he wrote his letter of June 17, 1963 indicating that the Vogts would settle for the property as called for by the Realty Company in its counsel's letter of June 6, 1963 to the Vogts if settlement were prior to June 21, 1963, that the first option contract existed. This was not discovered until October 22, 1963 long after the specific performance suit had been filed by the Realty Company. 2) Counsel for the Vogts expressly stated in the letter of June 17 that the settlement was to be "without waiver of their objections as to the invalidity of the contract of option submitted by Maryland City Realty, Inc." 3) There was an understanding on the part of counsel for the Vogts that the Realty Company would

accept title subject to the pending Andrew's suit. 4) The Realty Company was promptly notified on June 20, 1963 that there would be no settlement.

These facts prevent the application of any doctrine of waiver or of estoppel in this case as there was no full knowledge of all the facts and the legal rights involved when the alleged waiver was made, and the Realty Company was not, under these circumstances, entitled to rely on any "waiver". There was no inequitable or unconscionable conduct on the part of the Vogts which would estop them from raising their objections to the second option contract.

Comment is required in this case upon the unnecessary printing in the appellant's appendix. This appendix consisted of 297 printed pages. It was necessary to print the testimony of the witnesses substantially in full and to print the relevant documents *once,* because the decision of the case substantially turned on the facts. The appellant, however, has printed the second option contract (consisting of approximately 5 printed pages) as well as the letters of March 7, June 6, two of June 7, June 17, June 18, and three of June 19, 1963, *three* times—once at the end of the original bill of complaint, again at the end of the amended bill of complaint and still again at the end of the testimony. Then too, it was unnecessary to reprint the first 31 paragraphs of the amended bill of complaint which are substantially identical with corresponding paragraphs in the original bill of complaint. Nor was it necessary to print in full the affidavits and certificates of mailing attached to various pleadings and other documents. We estimate that there were at least 37 pages of unnecessary printing representing complete duplications of documents. This is not only contrary to Maryland Rule 828, but it represents an unnecessary and unproductive expenditure of money by the party involved. Inasmuch as the Realty Company will be required to pay the costs in this case, there is no occasion for the allocation of costs which would have been necessary if the appellant had been successful in this Court and if the costs had been assessed against the appellees.

*Decree affirmed, the appellant to pay the costs.*