## LUCAS ET AL. *v.* WAGNER

[No. 290, September Term, 1972.]

*Decided May 30, 1973.*

The cause was submitted on briefs to BARNES, McWILLIAMS, SINGLEY, SMITH and LEVINE, JJ.

Submitted by *Jack R. Turney* for appellants.

Submitted by *Fred A. Thayer* for appellee.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal by Adam J. Lucas and George E. Kley from a decree of the Circuit Court for Garrett County dismissing their bill of complaint for specific performance of an agreement entered into by them for the purchase of some 200 acres of land owned by the appellee, Robert D. Wagner. Since Wagner rested at the end of the complainants' case, the only evidence was that adduced by Lucas and Kley.

The agreement entered into by the parties, which Lucas and Kley sought to enforce, was the epitome of simplicity:

"On the date of March 11, 1972, I Robert Wagner agree to sell to Adam Lucas and George Kley the following items for the sum of $62,000:

1. Approx 200 acres of farm land located 2 miles east of McHenry, Md. which includes all buildings and improvements on said acreage — (Does not include my present home).

2. Farm equipment which consists of:

   a. milking equipment (tank etc.)

   b. barn cleaner

   c. silo unloader

"It is understood that Adam Lucas and George Kley agree to pay the sum of $62,000 on or before May 15, 1972 providing that there is a clear title to said acreage and there is no liens against said equipment

"It is understood that a bill of sale will be drawn up and final payment made on or before May 15, 1972.

/s/ George E. Kley   /s/ Adam J. Lucas   /s/ Robert D. Wagner."

It was this agreement which was the root of the difficulty. Wagner owned a tract of some 275 acres. It seems to be

conceded that he intended to retain title to the home place, as well as to certain undescribed acreage which he proposed to convey to his brother. Additionally, it would appear that the agreement was subject to an earlier contract under which Wagner had undertaken to sell some 75-80 acres to Donald Glotfelty. Only the retention of the home place was referred to in the agreement.

What seems to have happened was that Wagner had decided to give up farming, and was relying on realizing sufficient funds from the sales which he was making to satisfy the indebtedness on the farm, as well as amounts owed on certain equipment. When the results of a sale of equipment proved disappointing, with the consequence that he could not realize the amount which he needed, he refused to make settlement with Lucas and Kley.

The nebulous character of the understanding between the parties is perhaps best illustrated by the testimony of George E. Kley, who said he was the draftsman of the agreement:

"Q. What happened on March 11, what did you observe?

A. We— my brother-in-law had called Mr. Wagner that morning and said that I was in town and would like to come down and discuss the deal about selling the farm. We arrived there that morning, Adam Lucas and his son, Adam, Jr. and myself. Upon arriving there, I believe that Mr. Wagner was eating and he said that he would be a little while. After he come out from eating, then we proceeded to walk the boundaries. Although Adam Lucas had already walked them prior to that and knew the area and the farm in question, he wanted me to see it and be satisfied with what we were buying. We walked all the—we walked the boundaries in question. Adam went with Wagner to every, I think every corner. In particular, at one corner, little Adam and I stood up on a hill and we did not go down. Wagner told us about various things on the farm and happenings, and he pointed out that the

— on the Tower property how the dam had broken and he wanted — he wanted the dam water to go out and asked him if he would mind to let the water go into his drainage ditch. We went and saw various parts of the equipment and the back part of the farm et cetera.

Q. Did you walk around the boundaries of these exceptions, primarily the homesite, the lot to be excepted out for his brother?

A. Well, on the homesite, there were definite stakes which Mr. Wagner said that (inaudible) had put down, and they were flagged, and we noted all the corners of the homesite. We also went out and we looked at the other property that was supposed to be an exception, that his brother-in-law — he was going to give or sell, I'm not real sure, to, and we indicated and we walked over, and I believe there was a telephone pole, a guy-wire in the area, and we walked up to where the boundaries of the fence — his brother-in-law had a fence, and I think it was — and it was fenced off. We talked about that little piece of ground between his house and his brother's house which was maybe a hundred feet or two hundred feet, I'm not real sure, and that his wife was concerned that no one would put anything right squarely behind because they had a patio going out in the back of their home.

Q. Was there any question in your mind or was any question raised by Mr. Wagner concerning the boundaries of these exceptions at that time?

A. No, *on the house there was none.* At one time he did not want to sell that field that we — where his present house and his brother-in-law's sits, but we figured around and eventually we agreed on an arbitrary boundary for his brother-in-law — the amount of acreage, we were talking about an acre or something in that order, but until — we knew — we knew the boundary lines as far as I was

concerned, but I was not aware of exactly how
much — many acres, but I knew the boundary lines
involved in the whole sale." (Emphasis supplied)

Kley also said that the parties had not contemplated having
a survey made, until one was required by the bank which
had agreed to make a mortgage loan to the purchasers.

As the trial court noted, the rule of our earlier cases is
pellucidly clear:

"To obtain specific performance, the description
of the property involved must be such as will enable
the court to determine with certainty (and with the
aid, if necessary, of admissible extrinsic evidence)
what property is intended, reasonable certainty
only being required." *Grooms v. Williams*, 227 Md.
165, 172, 175 A. 2d 575 (1961)

or again, *Martin v. Michaels*, 259 Md. 346, 352, 269 A. 2d 833
(1970):

"The courts cannot supply a description of land
where the parties by their own contract have failed
to do so."

*See also Excel Co. v. Freeman*, 252 Md. 242, 246-47, 250 A. 2d
103 (1969) and *Sears v. Polan's 5¢ to $1.00 Store of
Annapolis, Inc.*, 250 Md. 525, 528-29, 243 A. 2d 602 (1968).

As the chancellor found — quite correctly, we think — the
contract did not delineate the boundary between the tract to
be sold to Lucas and Kley and the parcel which had been sold
to Glotfelty; nor did it locate the "homesite" to be retained
by Wagner; there was no mention of the location and size of
a parcel "across the road" which was apparently to be
excluded from the sale; there was neither an exception nor
description of the lot to be conveyed to Wagner's brother;
there was no reservation of rights of way to the parcels
which were reserved or excluded, and finally, none of this
could be clarified here by extrinsic testimony.

All of these were findings of fact, made by the chancellor
— findings which we are not inclined to disturb, Maryland
Rule 886, and on these facts, we regard his determination as

being within the proper exercise of his discretion, *Maryland City Realty v. Vogts,* 238 Md. 290, 302, 208 A. 2d 701 (1965) and entirely consonant with our prior decisions.

*Decree affirmed, costs to be paid by appellants.*