MYERBERG, SAWYER & RUE, P.A. et al.
v. DAVID M. AGEE et ux.

[No. 1363, September Term, 1981.]

*Decided June 3, 1982.*

The cause was argued before MOORE, LOWE and BISHOP, JJ.

*Ronald W. Fuchs,* with whom were *Paul F. Newhouse* and *Eccleston & Seidler* on the brief, for appellants.

*George R. Sparling* for appellees.

LOWE, J., delivered the opinion of the Court.

Appellants, a lawyer and his firm, were contractually engaged to examine title to unimproved property which appellees had contracted to purchase and, if title proved marketable, to effect the requisite conveyance. Appellants were informed that the appellees, who were moving from California, intended to build a new home on the site, which was to be financed and constructed on a predetermined schedule.

The conveyance was made by appellants who were apprised, and aware, of the consequences of unmarketable title, as well as the construction cost and interest increases that a delay may occasion in real estate transactions. Appellants verified the marketability of title and, as agents of a title insurance company, even elected to provide insurance therefor. They did not, however, inform appellees that there was no record of a right of ingress and egress between the property and a public way.

Based upon appellants' assurance of marketability, appellees obtained a loan commitment from the Maryland National Bank after negotiating a construction price with a builder. On February 9, 1979, John Hanson Briscoe, the

bank's attorney, informed appellants and appellees that his title search disclosed no recorded right of access to the property, and that the bank would not honor its commitment, absent some record of right of way.

After a time, appellants attempted to negotiate the purchase of a right of way from an adjoining landowner (at appellants' expense). Appellants also offered to purchase the property from appellees at their cost, or to sue the neighbor for an easement by necessity. Preliminary purchase negotiations for a right of way were unsuccessful because the cost of compliance with the servient property owner's requisites were too great, and, by that time, appellees had obtained other counsel. Eventually, in September of 1979, the title company delivered a mortgagee's title insurance policy which guaranteed title and access in the amount of the proposed loan. In October, appellees successfully sued their neighbor to establish an easement by necessity, which was judicially declared on June 23, 1980.

Suit was subsequently filed against both appellants and the title company. Although the original declaration contained counts in contract and tort, the tort count was stricken and the case was tried on the contract count only. On motion by appellees, the Honorable Perry G. Bowen, Jr., presiding in the Circuit Court for Calvert County, granted summary judgment on the issue of liability, holding

> "that the title to this property was unmarketable or unmerchantable from the time the Plaintiffs acquired it until the time this Decree was entered...."

He explained upon entering summary judgment:

> "That title is unmerchantable during that period of time because there isn't a single lawyer in this room that would have allowed a client not already in that chain of title to purchase it without warning him of the existence of this defect in the title ...."

Judge Bowen subsequently informed the jury convened to determine damages, that

"it has been determined as a matter of law that each of the defendants in this case . . . are liable for the damages, if any, which the plaintiffs have sustained by virtue of the fact that the title to this piece of property was not good and merchantable of record."

That ruling was the basis for the first question asked by appellants on this appeal.

"Is title to real property unmerchantable as a matter of law where there is no recorded means of access?"

Prefatorily, we caution that our response is limited to the facts of this case. Appellants point out, after equating an easement by necessity with adverse possession,

"[i]t is essential that the marketability of title for each parcel, whether the parcel is owned by adverse possession, or whether it enjoys access by an implied easement, must be evaluated on its own merits. There can be no blanket rule because such a rule is antithetical to the tests for determining the marketability of title, which rely entirely upon a reasoned and prudent examination of the facts underlying each case."

We note, however, that appellants point to no fact or facts underlying this case relating to marketability about which they contend there was a genuine dispute. Appellants' speculative allegation that

"[c]ircumstances are easily imagined in which the use of an unrecorded right of way is so entrenched in the life and practice of a community that the exercise of ordinary business prudence would not preclude purchase of the property which must make use of the implied unrecorded easement,"

is not a matter that we will address. While acknowledging that summary judgment may not be appropriate in every case, here as we have noted, appellants have pointed to no disputed facts despite their suggestions to the contrary.

— marketability —

The appellants conceded below that "whether the title to property is marketable is a question of law for the court," as held in *Berlin v. Caplan,* 211 Md. 333, 341 (1956), "and the opinion of a conveyancer or lawyer on that inquiry is here inadmissible." *Wlodarek v. Thrift,* 178 Md. 453, 469 (1940). Both parties rely upon *Berlin* for its definition of marketability. There the Court drew upon holdings of prior cases to provide an excellent compendium for the consideration of a trial judge faced with this determination. Each of the parties here have stressed the excerpts most favorable to their view, but the essence of the discussion in *Berlin* is simply that the threat of, or need for, litigation to hold or obtain good title is an essential element in determining marketability.

> "Of course, a vendee, by specific performance of a contract, should not be required to take real estate, the title to which is not free from doubt and which might subject him to litigation. Where the doubt as to the validity of the title produces real *bona fide* hesitation in a prudent man, not based on captious, frivolous, and astute niceties, the vendee should not be compelled by specific performance to take that title. *Cityco Realty Co. v. Friedenwald,* 130 Md. 329, 333, 100 A. 374. A title to be marketable need not be free from every conceivable technical criticism. However, if the defects are such as are sufficient to raise a reasonable doubt, such title is not marketable. *Garner v. Union Trust Co.,* 185 Md. 386, 390, 45 A. 2d 106. A marketable title is one which a reasonable purchaser, who knows the facts and their legal bearing, would be willing to accept in the exercise of that prudence which business men ordinarily use in the transaction of their own affairs. *Zulver Realty Co. v. Snyder,* 191 Md. 374, 384, 62 A. 2d 276. If there is a reasonable probability that the purchaser may be subjected to the hazard of litigation to defend his title, that title is not

marketable. *Zepp v. Darnall,* 191 Md. 68, 73, 59 A. 2d 774. A marketable title is one which is free from encumbrances and any reasonable doubt as to its validity and such that a reasonably intelligent person, who is well informed as to the facts and their legal bearing, and who is ready and willing to perform his contract, would be willing to accept in the exercise of ordinary business prudence. To be marketable the title must be so far free from defects as to enable the purchaser to not only hold the land in peace, but also, if he wishes to sell it, for him to be reasonably sure that no flaw in the title will appear to disturb its market value. A mere speculative possibility that a defect might appear sometime in the future will not render a title unmarketable. *Sinclair v. Weber,* 204 Md. 324, 334, 104 A. 2d 561." *Berlin, supra* at 343-344.

By equating adverse possession with an easement by necessity, appellants contend that the easement decreed in favor of appellees always existed, without regard to whether there had been a judicial declaration thereof.

"Enjoying an easement by necessity is similar to owning land by adverse possession, in that neither will be a matter of record until litigation has occurred. But the fact that litigation has not occurred does not entail that one does not have marketable title in either case. Indeed, it has long been recognized by the Maryland Courts that title to property held by adverse possession may be marketable. *Clarke v. Lacy,* 213 Md. 482 (1957). If title by adverse possession is free from doubt and can be clearly proven, specific performance of the contract of sale will be granted. *Garner v. Union Trust Co.,* 185 Md. 386 (1945)."

But appellants would overlook the factual qualifications of marketability vis-a-vis the facts they have recited to us in this case. Title by adverse possession is only marketable and thus specifically enforceable.

" '. . . if the title is so clearly proved and so free from doubt that it may serve as a proper foundation for a decree against the purchaser.' " *Clarke, supra* at 490, quoting *Garner, supra* at 390.

In the case before us there is neither evidence nor proffer that the access subsequently determined to be an easement by necessity was, at the time of transfer of the property,

"free from reasonable doubt as to any question of law or fact that may call it in question in the future and subject the purchaser to the hazard of litigation." *Garner, supra* at 389.

Precisely to the contrary, at the time the judge ruled, the undisputed facts were that litigation had been compelled and consummated by the decree of June 23, 1980. Appellants do not contend that the property without access is marketable and we need not decide the ephemeral question of whether an easement by necessity exists where a decree has not been obtained. Marketability is not concerned with the results of litigation, only with its likelihood. The judge did not err.

— damages —

The next four issues raised by appellants deal with damages. In their brief, appellants summarized the items which the judge permitted the jury to consider in determining damages:

"1. Economic loss occasioned by the fact that the construction loan did not close on February 9, 1979, made up of both increased costs of construction and increased costs of financing, measured by the difference between those costs in February, 1979, and March, 1981, the date of the trial.

2. Attorney's fees expended to establish access to the property.

3. Capital gains tax paid because Appellees did not meet the time limitations for purchasing an-

other residence with the proceeds obtained from the sale of the first residence.

4. The amount of the earned hazard insurance premium for the insurance which Appellees were compelled to purchase by the lending institution.

The jury returned a verdict in the amount of $66,491.94, of which $41,009.40 was assessed against the Appellants."

Appellants contend that:

"The extent of the increased costs of construction and financing were not foreseeable to the appellants, and, thus, appellants are not liable in contract for these damages."

Citing substantial authority that damages in this contract case are limited to those that are reasonably foreseeable, *Sergeant Co. v. Pickett,* 285 Md. 186, 193 (1979); *Reamer v. Kessler,* 233 Md. 311 (1964), appellants unsurprisingly do not contend that all of the aforesaid items of damage were unforeseeable so much as they complain of their magnitude.

"The increases in the costs of financing and construction which actually occurred in the instant case were of such a magnitude that even if increases of that same general kind were foreseeable, the increases which actually occurred were not foreseeable. It is thoroughly unreasonable to suppose that the Appellants could have foreseen that building costs would rise 48% in two years, or that interest rates would rise from 10½% to 15% plus two points in two years."

Appellants rely upon *Restatement (Second) of Contracts,* § 351, Comment (1981) for that premise.

"A contracting party is generally expected to take account of those risks that are foreseeable at the time he makes the contract. He is not, however, liable in the event of breach for loss that he did not at the time of contracting have reason to foresee as

a probable result of such a breach. The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable."

Upon analysis, the argument lacks both reason and logic. The appellants acknowledge that they were cognizant of a fluctuating economy. In light of such instability, any competent counsel should anticipate that the slightest fault in so delicate an economic balance would cause a tremor, if not a quake, which could result in a sudden rise in the inflation rate, or even a recessionary reversal. Considering the almost annual increases and pressures to increase allowable interest rates which may be empirically noted during the last decade, it is with some ill-grace that appellant argues that *any* attorney, even one of his experience and education, should not, as a matter of law, be charged with the foreseeability of the legislative interest increase permitted in 1979.

Even if foreseeability were considered "through the eye of the beholder," this appellant had extraordinary vision. In his deposition which was read to the jury, the individual appellant admitted a far more advantageous perspective in this regard than can be attributed to most lawyers.

"Question — Now, as an attorney at law, have you been engaged in transactions where the obtaining of a construction loan is involved? Answer — Yes. Question — And are you aware of the effect on a loan commitment that the discovery of unmarketable title had? Answer — Yes. Question — And what is that effect? Answer — They more than likely would not give you a loan under those circumstances, depending on what the question may be. Question — You say that you were also in the period of the mid seventies engaged in appraisal of real estate as well? Answer — Yes. Question — In the summer of 1978 did you have an awareness of the recent history of increases or decreases in

construction costs? Answer — In 1978? Question — Yes? Answer — Yes. I would assume that, as with everything else, things have been going up for a period of time. Question — So you were aware at that time that construction costs were increasing? Answer — Construction costs were increasing, yes. Question — And in August of 1978, as an attorney engaged in real estate law, were you aware of the trend in interest rates during the latter part of the 1970's? Answer — As I recall, they were going up. Question — You state that you have a Masters Degree in Taxation. Answer — Yes. Question — In obtaining that Masters Degree, did you become familiar with the rules with regard to capital gains taxation on the sale of real estate? Answer — Yes. Question — Are you familiar with the rules regarding capital gains taxation on the sale of real estate? Answer — Yes. Question — And were you so familiar with those rules in August of 1978? Answer — Yes."

But such exceptional perception is not really relevant to the test of foreseeability when applied to an attorney who is relied upon by a layman to protect his investment from pitfalls which are not readily apparent to those in foreign fields of endeavor.

Under the circumstances of this case, the trend was admittedly apparent and its extent was, therefore, concededly apparent. Furthermore, appellants do not contend that they were denied a requested instruction and we certainly decline to hold as a matter of law that such damages were unforeseeable.

Next appellants would have us believe that:

"The appellees' damages are limited to the difference in value between the property with a recorded means of access and the property without a recorded means of access, or in the alternative, the purchase price of the property as paid by appellees."

For their authority, appellants rely upon *Wlodarek, supra* at 468, which states that:

"In the case of a *total failure of title* to land purporting to be conveyed, the measure of damages suffered by the purchaser, whether the title was conveyed to the purchaser or his nominee, (a) *would* ordinarily *include* the full amount of the purchase price paid by the purchaser, and interest in the discretion of the jury." (Emphasis added).

Appellants then continue by contending that:

"The reason for the rule that the purchaser of real property may recover only the purchase price with interest is set forth in *Reamer v. Kessler, supra:* 'the negligent party should not be charged for unforeseeable changes in the market value of property' (233 Md. at 317.)"

This is not only a repetition of the foreseeability argument, but a misleading interpretation of *Reamer,* which addressed the precise contention that appellants make to us.

"In the instant case, the appellant would have us read the above passage as meaning that the purchase price paid (perhaps with interest) *is* the measure of damages. His contention thus is, in substance, that the measure of damages should be limited to out-of-pocket payments of principal (and perhaps in other cases, plus interest thereon). That is clearly *not* what Wlodarek says. Nor is it consistent with the measure of damages stated in *Kendall v. Rogers, supra,* 181 Md. [606] at 610-611, where the court quoted a passage from *Cochrane v. Little,* 71 Md. 323, at 33132, 18 A. 698, which concludes as follows:

'A client who has employed an attorney has a right to his diligence, his knowledge, and his skill; and whether he had not so much of these qualities as he was bound to have, or having them, neglected to employ them, the law properly makes him *liable*

*for the loss which has accrued to his employer.'* (Italics supplied.)

The above statement, though not the ground of decision, in *Kendall v. Rogers, supra,* is quoted from a case in which it was such a ground, and it is a clear recognition that the rule is applicable to a case involving the liability of an attorney growing out of an erroneous certification of title." *Id.* at 316-317.

We are unpleasantly surprised that appellants would so obviously misconstrue *Reamer* or *Wlodarek* without apprising us of its clear explication. They undoubtedly realized the consequence of the emphasized holding that "the law properly makes him liable *for the loss which has accrued to his employer."* That appellant Sawyer clearly had been made aware of "the loss which ha[d] accrued to his employer" is shown by his deposition, read to the jury by appellees' attorney:

"Let the record reflect that I am proceeding with line eighteen on page fifty-two. 'Question — Mr. Sawyer, at the time you settled this property for Mr. Agee, were you aware of the purpose for which he was buying it? Answer — Yes. Question — And what was that purpose? Answer — To build a house on it. Question — And were you aware of the source of his funds for the acquisition of this property? Answer — Yes. He was selling another house. Question — Do you know where that house was? Answer — No. I am not sure that I had that discussion with Mr. Agee as far as his house. I knew that this contract was apparently contingent upon his selling a house and we weren't able to go to settlement as far as that house being sold. As far as that particular house or the circumstances surrounding that house, I don't know.'

Let the record reflect I am moving to page fifty-four, line seven. 'Question — And were you aware at the time of settlement that he had sold his house? Answer — Yes. Question — And were you

aware that the proceeds were being used to acquire this land? Answer — Yes. Question — And were you aware of how he intended to finance the construction of a house on this lot? Answer — Yes. He had planned to get a mortgage. Not at this time. He wanted to wait awhile, or something along those lines, before he constructed it. But, yes, I was aware that he was going to build a house on it. Question — And were you aware, as a real estate attorney, that at the time he sought a loan from a lending institution the bank would require certification of title by their attorneys? Answer — Yes. Question — Were you aware that he would obtain a loan committment [sic] prior to the settlement of the construction loan? Answer — Yes. Question — And were you aware of the natural or the inevitable result upon the loan committment [sic] if the title was not found to be marketable? Answer — Yes. We discussed what he was going to do at a later time as far as getting involved in the construction contract to buy his house, and the idea was that when he got a loan he was going to come back and that we would take care of certifying the title for him and doing that for him. . . ."

Appellants next contend that it was error to deny their motions for directed verdict and judgments n.o.v. because:

"The undisputed testimony of the instant case reveals a reluctance on the part of the Appellees to minimize or mitigate the cost increases which would obtain upon the construction of the house."

That is not a fair reflection of the facts. Although appellants attempted to offer appellees some alternatives, appellants' efforts were directed more toward extricating themselves from their own dilemma than providing any reasonable solutions to appellees. Appellants negotiated an exchange of an easement from the adjoining landowner for the construction of a $6,000 macadam roadway, but this solution was

discarded because, according to appellant Sawyer, it "would be very expensive." Appellees declined an offer by appellants to purchase the property, since appellees were, by then, experiencing substantial inflation problems and losses with interest rates and construction costs. These losses could not be alleviated by accepting the purchase price and seeking another site, which may match neither the price nor the uniqueness of location of the original property.

But the reasonableness or unreasonableness of declining the mitigating offers was an issue for the factfinders to determine, and here was fairly submitted to the jury under explicit instructions by the trial judge. No objections or exceptions were taken to the instruction and no prayers offered relating to minimization or mitigation, so appellants must convince us that mitigation was compelled as a matter of law. Appellants' motion for a directed verdict does not permit them to address those issues otherwise, since they were unpreserved by specific objection. Md. Rule 757 h.[1]

---

1. The only instructions requested or objected to by appellants were as follows:

"(Mr. Fuchs) On behalf of Mr. Sawyer, we would object to the instructions which include as damages income tax that was paid and interest. We would also take an exception to the damages instructions on the basis that it does not provide that the damages in the case where an attorney searches title and the certificate of title is defective. The damages are the value of the property with the defect in the title subtracted from the value of the property as it should have been without the defect. We would also take an exception —

(Judge Bowen) Before you get to the next one, let's deal with that one. We did that when we were in Chambers, discussing both the instructions of the question of what is the correct method of proving damages in a case such as this. There was no evidence submitted to support the instructions which [were] requested either by the plaintiff of by either of the defendants. We conceded at that time that that is one way to assess damages and one way to measure damages in a case such as this. However, we do not believe that that is the only way. The damages which have been offered in evidence here far exceed the purchase price of this lot. In order to allow recovery for these damages we think that the evidence indicated to show that this was a matter of a piece of property purchased for a special purpose and the evidence in this case shows abundently [sic] that what it was, that everybody knew about this. I instructed them in this fashion over the objection of Mr. Fuchs who assisted in argument and then takes exception now to the instructions I gave and refusal to give the one I was just asked to give. I will give him an exception to the instructions which allowed

They concede here, and have at every level, that appellees are entitled to some damages. That was sufficient in itself to get to the jury. Specific limitations should have been prayed in the instructions if so desired.

The same foreseeability complaint and the same result are again addressed by appellants under yet a different caption when they contend that:

> "Damages for increased costs of financing and construction should be fixed within a reasonable time after the breach,"

again, presumably, as a matter of law.

They explain that:

> "The present era is one of extraordinary economic instability. Surely, the tendency of the economy to rampant inflation and the fluctuation of interest rates are worthy of judicial notice. In times like these, it is neither just nor commercially reasonable to place a contract defendant in a position where he cannot estimate what his damages will be simply because he had no idea of the date on which they will be measured."

Despite appellants' extensive discussion of their contention, it appears once more that the issue of the time at which damages became fixed was not preserved by objection to instructions or offer of other instructions limiting such damages. Md. Rule 757 h.[2] To the extent this issue may have been argued on motion for judgment n.o.v. or new trial, we cannot say that the denial of those motions was an abuse of discretion, if for no other reason than that neither the issue of mitigation or of a fixed time for damages was the subject

---

the interest as an element of damage in the first element as I discussed before the Jury as well as to the income taxes element of damage. And I will give him also an exception to my instruction on this theory rather than on the before and after value theory.

Does that cover your exceptions fairly?

(Mr. Fuchs) Yes, sir."

**2.** That appellants twice objected, without explanation, to questions relating to this subject matter does not avert this failure to preserve the issue explicitly.

of instructional objection or recommendation. Appellant cannot proceed on one theory of defense at trial and expect to be permitted a second try at some alternative subsequently conceived.

If it would be of any comfort to appellants, we will reflect that under the circumstances of this case, as reviewed upon appeal, we agree with the trial judge that, overall, the damage issues and the contrasting damage theories were fairly submitted to the jury. Appellees did not profit from the loss occasioned by the appellants' breach. They were barely made whole. The unfortunate oversight on which this case was based was a costly one, but it was made by one who was hired precisely for the purpose of averting the consequent losses. It is he, and his firm, who must bear them.

*Judgment affirmed.*
*Costs to be paid by appellants.*