905 F.2d 1203
 Bankr. L. Rep. P 73,431
GIBRALTAR SAVINGS, State Federal Savings and Loan
Association of Lubbock and Gateway Savings Bank, Appellants,
v.
COMMONWEALTH LAND TITLE INSURANCE COMPANY, Appellee.
COMMONWEALTH LAND TITLE INSURANCE COMPANY,
v.
POPHAM, HAIK, SCHNOBRICH, KAUFMAN AND DOTY, LTD.
 No. 89-5038.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 11, 1989.
Decided June 21, 1990.
 
 Alan L. Kildow, Minneapolis, Minn., for appellants.
 Kay Nord Hunt, Minneapolis, Minn., for appellee.
 Before McMILLAN and WOLLMAN, Circuit Judges, and SNEED,* Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 Gibraltar Savings, State Federal Savings and Loan Association of Lubbock (State Savings), and Gateway Savings Bank (Lenders) appeal from the district court's[1] grant of summary judgment in favor of Commonwealth Land Title Insurance Company (Commonwealth). We affirm.
 
 I.
 
 2
 Waterfront Companies, Inc. offered to purchase property in downtown Minneapolis known as the Milwaukee Road Depot (Depot) for $9.5 million. The offer was accepted on November 17, 1981. Closing was to be held within 90 days.
 
 
 3
 After experiencing difficulty in obtaining financing during the numerous extensions of the closing date, Waterfront filed for bankruptcy on December 21, 1982, to protect its rights under the purchase agreement. On April 5, 1983, the bankruptcy court approved Waterfront's application to incur secured indebtedness. On April 12, 1983, State Savings made a $13 million loan to Waterfront secured by a mortgage lien against the Depot, which Waterfront finally purchased that same day. Commonwealth issued a title policy insuring Lenders' mortgage lien that same day. Endorsement No. 2 of the policy insured Lenders against possible defects in the bankruptcy:[Commonwealth] insures against any loss, damage, costs * * * or lack of marketability of title or any interference or disruption of the lien of the mortgage or the priority thereof or any proceeds due thereunder as a result of any bankruptcy proceeding existing as of the date [of the policy.]
 
 
 4
 In May 1984, Lenders notified Waterfront that the loan was in default. In August 1984, Lenders sought to foreclose on the Depot. Waterfront was still in bankruptcy, however, and the mortgage lien was subject to the automatic stay imposed by the Bankruptcy Code, 11 U.S.C. Sec. 362, as it was when the title policy was issued. Lenders sought relief from the automatic stay to pursue foreclosure. A hearing was held in December 1984. At that time, unpaid principal and interest amounted to more than $14.7 million, with interest accruing at $5,146 per day. An appraisal presented by Lenders indicated that the Depot was worth approximately $17 million. In opposing Lenders' motion, the bankruptcy trustee contended that Lenders were adequately protected because the property was worth at least $20 million.[2] In January 1985, the bankruptcy court found that the value of the Depot was at least $20 million and denied the motion to lift the automatic stay. Lenders appealed the order of denial to the district court.
 
 
 5
 In February 1985, Lenders filed a claim under the policy, notifying Commonwealth that the "automatic stay as continued under the Order constitutes a loss under Endorsement No. 2 of the policy." Commonwealth denied the claim based on its view that the Lenders had not sustained any "loss or damage," as required by the policy, and that the refusal to lift the automatic stay was not a final determination within the terms of the policy.
 
 
 6
 In April 1985, while Lenders' appeal from the bankruptcy court was pending before the district court, Waterfront's trustee in bankruptcy commenced an adversary proceeding against State Savings that challenged the validity of the mortgage and the equity participation agreement. Commonwealth undertook the defense of this action at State Savings' request.
 
 
 7
 On August 5, 1985, the district court affirmed the bankruptcy court's order denying the motion to lift the automatic stay. Lenders appealed that decision to this court.
 
 
 8
 In December 1985, Lenders notified Commonwealth that they intended to enter into a settlement with the bankruptcy trustee. Lenders allowed the trustee to sell the Depot for $15.5 million. The settlement agreement provided that in return for the dismissal of all claims by the parties, Lenders would receive $13.85 million from the sale proceeds. Lenders agreed to forego about $2.6 million in accrued interest. Commonwealth was not involved in the negotiations and objected to the settlement. The bankruptcy court approved the settlement, which included dismissal of the appeal of the order denying the motion to lift the automatic stay and the trustee's adversary proceeding against Lenders.
 
 
 9
 Lenders then brought this action against Commonwealth. The district court found that Commonwealth had properly denied the claim because Lenders had not suffered any actual loss or damage covered by the terms of the policy. This appeal followed.
 
 II.
 
 10
 In addition to Endorsement No. 2, quoted above, the relevant provisions of the title policy read as follows:
 
 
 11
 The following matters are expressly excluded from the coverage of this policy:
 
 
 12
 3. Defects, Liens, encumbrances, adverse claims, or other matters * * * (c) resulting in no loss or damage to the insured claimant[.]
 
 7. LIMITATION OF LIABILITY
 
 13
 No claim shall arise or be maintainable under this policy * * * (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured, as provided in paragraph 3 hereof: or (c) for liability voluntarily assumed by an insured in settling any claim or suit without prior written consent of the Company.
 
 
 14
 Lenders contend that they suffered a loss covered by the policy as a result of the bankruptcy court's refusal to lift the automatic stay and that that loss is covered by the policy under Endorsement No. 2. The district court found that this provision did not provide Lenders with coverage for their loss, stating:
 
 
 15
 The lenders lost money on their loan to the Waterfront Companies. If that loss had been due to a defect in title or an encumbrance on the mortgage; then they would be entitled to indemnity from Commonwealth. However, the lenders are seeking recovery for a bad debt, not a faulty lien. These damages are beyond the scope of the parties' contract.
 
 
 16
 District Court opinion at 9.
 
 
 17
 The district court also found that Lenders had violated condition 7(c) of the policy by settling with the trustee without Commonwealth's consent.
 
 
 18
 "A title policy is a contract of indemnity, not of guaranty," and provides reimbursement for actual loss only. Diversified Mortgage Inv. v. United States Life Title Ins. Co. of New York, 544 F.2d 571, 575 n. 2 (2d Cir.1976). A title insurance policy provides for indemnity "only to the extent that [the insured's] security is impaired and to the extent of the resulting loss that it sustains." Id. We agree with the district court that Lenders did not suffer a loss as defined by the policy. There has been no final judicial determination adverse to Lenders' mortgage lien. The dismissal of the appeal to this court from the district court's order affirming the bankruptcy court's finding that the section 362 stay should not be lifted because Lenders were adequately secured left that finding unassailed and gives lie to Lenders' contention that the stay somehow resulted in a loss covered by Endorsement No. 2. As the bankruptcy court observed, "while the Savings and Loan may not be paid as soon as it would like, it is clear that it will be paid and that is what adequate protection is all about." Lenders were ultimately content to leave this finding stand, and they will not now be heard to contend that, having made a bad bargain, they should now be able to look to Commonwealth for relief. Having elected to settle their dispute with the Trustee over Commonwealth's objections and in direct conflict with the express terms of the policy, Lenders foreclosed a determination of loss that might otherwise have been covered by the policy.
 
 
 19
 The district court's judgment is affirmed.
 
 
 
 *
 The Honorable Joseph T. Sneed, United States Circuit Judge for the Ninth Circuit, sitting by designation
 
 
 [1]
 The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota
 
 
 [2]
 Lenders possessed an appraisal by Norwest Banks that appraised the Depot at less than $10 million. This appraisal was not presented to the bankruptcy court