676 A.2d 953

**STEWART TITLE GUARANTY COMPANY**

v.

**Thomas W. WEST, et ux.**

**No. 1077, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

May 29, 1996.

**118**

J. Mitchell Kearney (Miles & Stockbridge, on the brief), Baltimore, for appellant.

James D. O'Connor, Towson, for appellees.

Argued before BLOOM, WENNER and HOLLANDER, JJ.

HOLLANDER, Judge.

This appeal arises out of a claim by Thomas W. West and his wife, Dawn K. West, appellees, against Stewart Title Guaranty Company ("Stewart Title"), appellant, for breach of a title insurance policy. When the Wests purchased real property in New Windsor, Maryland in 1987, they obtained a title insurance policy issued by Stewart Title. In 1990, they filed suit in the Circuit Court for Carroll County against several defendants, including appellant, alleging that the land that they received was not what they had been promised in their contract, that their property lacked access to any public rights of way, and that defects in the title rendered the property unmarketable.

The circuit court entered summary judgment against Stewart Title on the ground that the Wests' property was unmarketable. It awarded damages, prejudgment interest, and attorneys' fees in the total amount of $272,978.68. Aggrieved

by this decision, Stewart Title now appeals and presents multiple issues for our consideration:

I. Did the lower court err in entering summary judgment against Stewart Title in the absence of an affidavit or any other competent evidence demonstrating that Stewart Title breached the policy?

II. Did the lower court err in entering summary judgment against Stewart Title in light of the provision which limits claims against the insurer in the event of litigation until there has been a final determination by a court of competent jurisdiction adverse to the title?

III. Did the lower court err in entering summary judgment against Stewart Title in the absence of certain necessary parties?

IV. Did the lower court err in awarding Appellees damages in excess of the face amount of the title policy?

V. Did the lower court err in awarding Appellees damages in excess of their actual loss?

VI. Did the lower court err in awarding Appellees attorney's fees and pre-judgment interest?

For the reasons discussed below, we conclude that summary judgment was improper. Therefore, we shall vacate summary judgment and remand for further proceedings.

## FACTUAL BACKGROUND

This case involves a long and complex factual and procedural history. We have gleaned the following summary of facts from the record.

In 1986, the Wests searched for property on which to build a home; they were particularly interested in land that was suitable for raising horses. In December of 1986, a real estate agent, Joseph M. DeChiara, showed them an unimproved 3.3658 acre parcel in Carroll County ("the Property"), owned by Adele Building & Supply Company ("Adele"). According to a plat of the land that DeChiara showed them, the Property was to have separate means of access to two nearby public

roads: Springdale Road to the west and Rowe Road to the south.

On June 6, 1987, the Wests signed a New Home Sales Agreement with Adele to purchase the Property, on which Adele was to construct a house. A plat of the Property, which was prepared by Sylvia Gorman, Adele's listing agent, was attached to the agreement. The plat, like the one that De-Chiara previously had shown to the Wests, showed that a .4 acre triangular parcel of land in the northeast corner of the Property ("the triangular parcel") was included in the Property. In addition, the plat indicated that, although the Property would be almost completely surrounded by adjacent properties, the Wests would have access to Springdale Road by means of a "panhandle strip" that they would own in fee simple, and they would also have use of a right-of-way to Rowe Road ("the right-of-way"). Attached to the agreement was a "Right-of-Way Agreement and Declaration of Maintenance Obligations" for the common use of the right-of-way.

After the house was constructed, the Wests hired Land Title Research of Maryland, Inc. ("Land Title") as their settlement agent. At settlement on June 26, 1987 in Land Title's offices, the Wests purchased two title insurance policies issued by Stewart Title. The first policy was an "owner's policy" ("the Policy") insuring the Wests, with a coverage limit of $112,640.00. The second policy was a "lender's policy." [1] The owner's policy stated, in part, as follows:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN. SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, STEWART TITLE GUAR-ANTY COMPANY, a corporation of Galveston, Texas, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the

---

1. As the Wests did not pay for their Property entirely in cash, they obtained a mortgage loan from Margaretten & Co., Inc. ("Margaretten"), in the amount of $97,500.00. The lender's policy from Stewart Title insured Margaretten in the full amount of its loan.

amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;
2. Any defect in or lien or encumbrance on such title;
3. Lack of a right of access to and from the land; or
4. Unmarketability of such title.

(Capitalization in original.)

At settlement, the Wests also obtained the deed to the Property, which contained a metes and bounds description of the Property. Unknown to them at the time, however, the deed did not convey either the triangular parcel or the panhandle strip. As the Policy contained the same erroneous Property description, it did not include the triangular parcel or the panhandle strip.

The Wests did not learn of any problems with the title to their Property until the spring of 1988, when Mr. West was clearing shrubs in the triangular parcel. Lawrence E. Peach, who, along with his wife, Deborah A. Peach, owned the immediately contiguous parcel of land, approached Mr. West and told him that he believed Adele had sold the triangular parcel to *him*, and that he would look into the matter. After the Wests heard nothing from Peach for several weeks, they decided to look into the matter themselves. Mr. West obtained a copy of his deed and "plat plan"[2] and took them to a surveyor, Daniel Staley, who earlier had prepared a survey of the Property that the Wests ordered for settlement but, apparently, never received.

After Staley compared the deed and his survey of the Property, he advised the Wests of several problems with their title. First, neither the triangular parcel nor the panhandle

---

**2.** The parties refer to the Wests' "plat plan," but we have not found the "plat plan" in the record. Moreover, a reference to a "plat plan" has no inherent meaning, in contrast to a recorded subdivision plat.

strip was conveyed to the Wests. Second, the Wests were "landlocked," because their Property had no access to any public roads. Moreover, in what both Stewart Title and the Wests agree was a mistake, the instrument by which Adele had previously created the right-of-way actually identified the *Peaches'* lot, and not the Wests' lot, as one of the properties benefited by the right-of-way. Accordingly, the Wests were not entitled to use the right-of-way. In fact, in 1990, Donald A. Dustin, the owner of the property that the right-of-way crossed, hired an attorney who sent the Wests a letter instructing them not to use the right-of-way across his property. Dustin also erected cattle fencing and a barricade that substantially narrowed the right-of-way and made it difficult for the Wests to drive their horse trailers on it, although the right-of-way was not completely blocked.

Thereafter, in the summer of 1988, the Wests contacted Joseph Goldberg, the president of Land Title. Goldberg examined the Wests' deed, their "plat plan," and Staley's survey and agreed that the Wests were landlocked. Goldberg told the Wests not to contact anyone about the problems, and that he would take care of everything. Apparently, Goldberg made several attempts to contact Adele about the Wests' difficulties, but he ultimately was unsuccessful in resolving the problems. In December 1988, Ms. West contacted Goldberg about his progress. Goldberg advised her that, although he could resolve the problems involving access to Rowe and Springdale roads, he could not resolve the problem involving the triangular parcel because that parcel was not covered by the Wests' Policy. He advised Ms. West that she and her husband should hire an attorney.

At some point during this time period, the Wests discovered an additional problem with their title; Adele had left two unreleased mortgages on their Property. The parties agree, however, that, shortly after the Wests filed suit, Land Title was able to procure the release of both liens.

The problems with their title caused the Wests to have difficulty obtaining a second mortgage and re-financing for

their Property. In 1990, they obtained a $34,000.00 second mortgage from Atlantic Federal Savings Bank, but at an interest rate of 13%, which was higher than the rate generally available.[3] In 1992, Atlantic Federal offered its employees an opportunity to obtain financing on their homes at the reduced rate of 7 1/2%. The Wests wanted to re-finance and consolidate their two mortgages at that time, but their application was denied because of the unmarketable status of their Property.

On June 22, 1990, the Wests filed a multi-count complaint in the Circuit Court for Carroll County against Adele, Robert L. Thomas (Adele's president), Land Title, Goldberg, Gorman, Long and Foster Real Estate, Inc. (Gorman's employer and the listing broker for the Property), DiChiara (alleged to be the "selling agent" for the Property), Coldwell Banker Residential Real Estate, Inc. (DiChiara's employer), and Stewart Title. As to Stewart Title, appellees asserted a breach of contract and a negligence claim. They alleged, *inter alia*, that "the Plaintiffs purchased a policy of title insurance from Stewart Title . . . whereby Stewart agreed to insure against defects or unmarketability of the title to the property and to insure a right of access to and from the land," that "there are defects in the title, the title is unmarketable and the Plantiffs' [sic] lack a right of access to and from the land," and that "Stewart has failed to provide good and marketable title and access to and from the land and [in] breach of its agreement to insure same. . . ." In their negligence claim, appellees alleged that appellant breached its "duty of care to the Plaintiffs to adequately supervise Stewart's agents. . . ."

After suit was filed, settlement negotiations occurred among the parties and the Wests' neighbors. Several proposals were made that included various confirmatory or corrective conveyances to resolve the Wests' title problems. But these negotia-

---

3. Ms. West is employed as an executive secretary for the chairman of the board and chief executive officer of Atlantic Federal. She testified that she obtained the loan because of her employment, but nevertheless was required to accept a higher interest rate.

tions were unsuccessful and, on October 6, 1992, the Wests filed a second amended complaint, adding two new counts and several new defendants (the Peaches, Dustin, and Leonard and Deborah Crunkilton, who owned the other parcel of land benefited by the right-of-way). The Wests asked for a declaratory judgment or the appointment of trustees to execute confirmatory deeds, or both, to establish the following: the Wests, and not the Peaches, were entitled to use the Rowe Road right-of-way; the Wests were the owners of the panhandle strip; Dustin did not have a right to use the right-of-way to Springdale Road.

At the same time that they filed their second amended complaint, the Wests filed a motion for summary judgment against Stewart Title, Land Title, and Goldberg. The motion asserted that these three defendants had issued to the Wests a title insurance policy from Stewart Title, that title to the Property "is defective, Plaintiffs lack access to and from the land and title is unmarketable," and that the defendants "have failed and refused to pay the Plaintiffs' loss" or costs and "have failed and refused to take the actions necessary to cure said defects." It added that the defendants had "failed and refused to take any action whatsoever regarding these claims as a result of which the Plaintiffs have been forced to file this litigation." Attached to the motion was a copy of a portion of the Policy, but no affidavit was attached to the motion.

On December 30, 1992, Stewart Title filed both a response to the Wests' motion and a cross-claim seeking the same relief with respect to the right-of-way that the Wests had sought in their second amended complaint. In its response to the Wests' motion, Stewart Title asserted that, since neither the triangular parcel nor the panhandle strip was included in the description of the Property insured by its Policy, "any alleged defects which arise with respect to these areas and which may affect marketability or access are not covered by the Policy." Stewart Title asserted that the Wests' second amended complaint and its own cross-claim constituted "litigation" about this title defect, and Paragraph 7(b) of the Policy precluded

the Wests from pursuing their claim against Stewart Title until the litigation reached a final conclusion.

A hearing was held on the motion, at which the Wests' counsel outlined the problems with his clients' title associated with the triangular parcel, the panhandle strip, and the right-of-way. The Wests argued that they were entitled to collect under their Policy under any of three provisions: (1) the provision insuring against "unmarketability" of their title; (2) the provision insuring against "lack of a right of access" to and from their land; or (3) the provision insuring against defects in the title.

The circuit court granted the motion in a written opinion, dated May 18, 1993. After reviewing the conveyances in the Wests' subdivision, the court stated:

[A] rudimentary examination of the public record reveals the serious title defects of which the plaintiffs now complain. It is, therefore, apparent that Goldberg and Land Title conducted settlement on this land without examining the source of Adele's title and without properly examining the public record to determine what real property Adele owned.

The court recited the following problems with the Wests' property:

1. The Property "has no express access to Rowe Road."

2. The Wests "lack fee simple access to a public right of way."

3. They "may or may not be benefitted by a right of way to Springdale Road."

4. The "property is burdened by two liens which they did not create, having an aggregate principal amount of $101,-200.00." [4]

5. "Separate from and in addition to [the Wests'] lack of access problems," there was the problem that their Property "may be burdened by an unrecorded right of way" between

___

[4] As Stewart Title asserts, and the Wests agree, the court was apparently unaware that these liens had been previously released.

Dustin's lot and the Peaches' lot. The court cited the fact that Dustin received in his deed a right-of-way over the Peaches' land to Springdale Road, while the Peaches' deed (as a result of the mistake discussed earlier) granted them a right-of-way over Dustin's land to Rowe Road. But since the Wests' land is between Dustin's and the Peaches' lots, the Wests' Property "could be subject to an unrecorded right of way in favor of the Peach and Dustin lots."

From the foregoing, the court concluded that the Property was "unmarketable" and entered summary judgment in favor of the Wests and against Goldberg, Land Title, and Stewart Title. The court also instructed the clerk to set a date for an inquisition on the Wests' damages. The inquisition was held on September 30, 1994. After the inquisition, the circuit court assessed damages against Stewart Title, Land Title, and Goldberg, jointly and severally, in the amount of $272,978.68. This figure consisted of $175,000.00 for the value of the Property, $2,000.00 for the value of the triangular parcel,[5] $650.00 in appraisal fees, attorneys' fees in the amount of $18,195.68, and $77,133.00 in prejudgment interest. The court also assessed additional damages of $66,275.00 against Land Title and Goldberg, as compensation for the Wests' "having to live with this mess."

Stewart Title subsequently filed a motion to alter or amend the damages award or, alternatively, for reconsideration. At the hearing, Stewart Title's counsel stated to the court that "almost 90%" of the defects with the Wests' title had been resolved. He asserted that the Wests had already received both the triangular parcel and the panhandle strip, and he expected that a "confirmatory right-of-way agreement" would be signed by the Crunkiltons and the Peaches shortly. The Wests' counsel did not dispute that almost ninety percent of the problems had been resolved, although he asserted that the

---

5. Matthew Smith, a certified real estate appraiser retained by the Wests, testified at the inquisition that the value of the triangular parcel was $5,000.00. The court did not explain why it awarded a different figure.

resolution had occurred through the Wests' efforts. At the conclusion of the hearing, the court denied Stewart Title's motions. With respect to the motion to alter and amend, the court stated:

By the terms of the title insurance policy . . . Stewart had two choices upon notice that the title defects existed. One was to correct the defects in the title—all defects, or two, pay the Plaintiffs the face amount of the policy, $112,640.00. Stewart failed to do either, and having failed to perform their obligations under the policy, Stewart breached the contract with the Plaintiffs.

Accordingly, the Court has determined . . . to deny the Motion to Alter or Amend. I don't feel that you can breach a contract and then attempt to rely on the protections of the contract.

At the request of both parties, the court certified the judgment against Stewart Title as final under Rule 2–602(b). We agree that this certification was appropriate under the rule and applicable case law. Stewart Title noted a timely appeal.[6]

## DISCUSSION

### I.

Stewart Title contends that the circuit court erred in entering summary judgment against it, because there were disputed issues of material fact. It also complains that the court's written opinion does not contain a "finding" that it breached its insurance contract, but instead only concluded that the Wests' Property was "unmarketable." Appellant objects to the trial court's statement some two years later, at the hearing on its motion to alter or amend, that it had "breached" the Policy. Appellant argues that "[f]or the lower court to state for the first time two years after the issuance of its May 18,

---

6. During the course of the litigation below, Land Title went into receivership. On May 8, 1995, the circuit court granted the receiver's motion to stay proceedings against Land Title.

1993 Memorandum Opinion that Stewart Title breached the Policy ... violates every fundamental concept of fairness and due process." It further asserts that there is no evidence to support the court's conclusion that it breached the Policy. In order for us to examine these issues, we begin with a review of the fundamental principles of title insurance.

A title insurance policy protects the insured against loss or damage as a result of defects in or the unmarketability of the insured's title to real property. 7 POWELL ON REAL PROPERTY ¶ 1029 at 92–5 (1995); John Alan Appleman & Jean Appleman, INSURANCE LAW AND PRACTICE § 5201 at 2 (1981); *Walters v. Marler*, 83 Cal.App.3d 1, 18, 147 Cal.Rptr. 655, 665 (1978). Its purpose is to safeguard a transferee of real estate from the possibility of a loss through defects that may cloud the title. Appleman, INSURANCE LAW AND PRACTICE, § 5201 at 8; *McLaughlin v. Attorneys' Title Guaranty Fund*, 61 Ill. App.3d 911, 18 Ill.Dec. 891, 895, 378 N.E.2d 355, 359 (1978).

Ordinarily, there are three components of title insurance. D. Barlow Burke, Jr., REAL ESTATE TRANSACTIONS: EXAMPLES AND EXPLANATIONS 185 (1993). First, it is an indemnity agreement to reimburse the insured for loss or damage resulting from title problems. *Id.* Second, it is "litigation insurance," by which the insurer is required to defend the insured in the event the insured's title is attacked by a third party. *Id.* Finally, and "perhaps above all, it involves the hiring of experts in title matters." *Id.*

The predominant view today is that title insurance—at least as to its first-party aspect—is a contract of indemnity, and not a contract of guaranty or warranty. *See First Federal Savings and Loan Ass'n of Fargo, N.D. v. Transamerica Title Insurance Co.*, 19 F.3d 528, 530 (10th Cir.1994); *Chicago Title Insurance Co. v. McDaniel*, 875 S.W.2d 310, 311 (Tex. 1994); *Karl v. Commonwealth Land Title Insurance Co.*, 20 Cal.App.4th 972, 978, 24 Cal.Rptr.2d 912, 915 (1993), *rev. denied* (March 17, 1994); *Gibraltar Savings v. Commonwealth Land Title Insurance Co.*, 905 F.2d 1203, 1205 (8th Cir.1990); *Willow Ridge Limited Partnership v. Stewart Title Guaranty*

*Co.,* 706 F.Supp. 477, 480 (S.D.Miss.1988), *aff'd without opinion,* 866 F.2d 1419 (5th Cir.1989); *Green v. Evesham Corp.,* 179 N.J.Super. 105, 430 A.2d 944, 946, *cert. denied sub nom. Midatlantic Nat'l Bank v. Chicago Title Insurance Co.,* 87 N.J. 422, 434 A.2d 1095 (1981). *See also* Appleman, INSURANCE LAW AND PRACTICE, *supra,* § 5201; 13A COUCH ON INSURANCE § 48:111 (Mark S. Rhodes rev. ed.1983). Consequently, a title insurer does not "guarantee" the status of the grantor's title. *Falmouth National Bank v. Ticor Title Insurance Co.,* 920 F.2d 1058, 1062 (1st Cir.1990).

■ As an *indemnity* agreement, the insurer agrees to reimburse the insured for loss or damage sustained as a result of title problems, as long as coverage for the damages incurred is not excluded from the policy. *First Federal Savings & Loan Ass'n of Fargo, supra,* 19 F.3d at 530; *Focus Investment Associates, Inc. v. American Title Insurance Co.,* 992 F.2d 1231, 1237 (1st Cir.1993); *Lawrence v. Chicago Title Insurance Co.,* 192 Cal.App.3d 70, 74–75, 237 Cal.Rptr. 264, 266 (1987). We recognize, however, that there are cases that suggest that a title insurance policy constitutes a guaranty or warranty of title. *See Zions First National Bank v. National American Title Insurance Co.,* 749 P.2d 651, 653 (Utah 1988) ("title insurance is in the nature of a warranty"); *Drilling Service Co. v. Baebler,* 484 S.W.2d 1, 18 (Mo.1972); *Lawyers Title Insurance Corp. v. Research Loan & Investment Corp.,* 361 F.2d 764, 767 (8th Cir.1966); *Luboff v. Security Title & Guaranty Co.,* 46 Misc.2d 599, 260 N.Y.S.2d 279, 283 (N.Y.Sup. Ct.1965).

■ When an insured notifies an insurer of a title problem, the insurer ordinarily has three choices. It may either (1) pay the insured for the loss up to the amount of the coverage limits of the policy, *see* 15A COUCH ON INSURANCE § 57:172; (2) clear the title defect within a reasonable time, *see* Appleman, INSURANCE LAW AND PRACTICE § 5214; or (3) show that the alleged unmarketability or other title problems do not really exist, and thus there is no way in which the insured could sustain any loss. *See* 15A COUCH ON INSURANCE § 57:177.

■ In cases such as this one, a critical issue is when a title insurer may be deemed to have "breached" its insurance contract. Some authorities take the position that, when title is defective at the time the policy is delivered, the policy is breached and the insurer is immediately liable to the insured, even though the exact amount of legal loss would not necessarily be definitively ascertained at that juncture. *See Walker v. Transamerica Title Insurance Co.,* 65 Wash.App. 399, 828 P.2d 621, 624 n. 4 (1992); *Peoples Downtown National Bank v. Lawyers' Title Guaranty Fund,* 334 So.2d 105, 107 (Fla. Dist.Ct.App.1976); *In re Gordon,* 317 Pa. 161, 176 A. 494, 495 (1935); COUCH ON INSURANCE 2D, *supra,* § 48:113 at 109.

Other authorities, however, take the position that an insurer is not immediately in breach simply because title is defective on the day the policy is issued. Appleman, INSURANCE LAW AND PRACTICE, *supra,* § 5214 at 86; COUCH ON INSURANCE 2D, *supra,* § 57:172. Instead, their position is that, if defects are discovered, the insurer may comply with its obligations under the contract if it clears the title defects within a reasonable time. *See* Appleman, § 5214 at 86. For example, in *Sala v. Security Title Insurance & Guarantee Co.,* 27 Cal.App.2d 693, 81 P.2d 578 (1938), the court stated:

> The theory of the trial court, and the contention of respondents as well, fails to take into account the contract in its entirety, and by thus disregarding the rights of the title company under the terms of the contract, assumes that the title company breached the contract as of the day the insurance policy was issued and that therefore on said date was liable in damages.... Such a theory is obviously unsound for the reason that it forecloses the title company, if it elects so to do, from exercising its right, according to the terms of the policy, to clear the title. Manifestly, the insurance policy must be construed in its entirety, and it was as much the right of the insurance company to perform the contract according to its terms as it was the right of the assured to expect payment in the event of a failure upon the part of the title company so to do.

*Id.,* 81 P.2d at 583. *See also George K. Baum Properties, Inc. v. Columbian National Title Insurance Co.,* 763 S.W.2d 194, 201–02 (Mo.Ct.App.1988) (insurer's mere failure to pay claim does not, in and of itself, constitute a breach, when insurer has other options under the policy, including instituting suit or other actions deemed necessary or desirable in order to establish title in the insured).

■ We conclude that the latter view of what constitutes a "breach"—that the insurer is not immediately in breach simply because title is defective on the day the policy is issued—is more in line with both title insurance law and the standard form title insurance policy that we have before us. As we have observed, a title insurer does not guarantee the state of the title. Instead, a title insurance policy is a contract of indemnity. The view that a title insurer is in breach simply because there are defects in the title at the time the policy is issued would turn the title insurer into the guarantor of the grantee's title. Other courts that have construed standard form title insurance policies have held that a title insurer is not automatically in breach simply because the insured property is conveyed in an unmarketable state or with title defects; "the mere existence of a defect covered by the policy in and of itself is not sufficient to justify recovery." *Falmouth National Bank, supra,* 920 F.2d at 1063.

■ Paragraph 5 of the Policy is titled "Options to pay or otherwise settle claims." It states:

The Company shall have the option to pay or otherwise settle for or in the name of the insured claimant any claim insured against or to terminate all liability of the Company hereunder by paying or tendering payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred up to the time of such payment or tender of payment, by the insured claimant and authorized by the Company.

Moreover, Paragraph 7(a) of the Policy provides Stewart Title with the option to clear a title defect in accordance with its contractual obligations. It states:

> No claim shall arise or be maintainable under this policy . . .
> if the Company, after having received notice of an alleged
> defect, lien or encumbrance insured against hereunder, by
> litigation or otherwise, removes such defect, lien or encum-
> brance or establishes the title, as insured, within a reason-
> able time after receipt of such notice.

The contractual language is consistent with the position that
"a title insurance policy is breached only *after* notice of an
alleged defect in title is tendered to the insurer and the
insurer fails to cure the defect or obtain title within a reason-
able time thereafter." *First Federal Savings & Loan Ass'n of
Fargo, supra,* 19 F.3d at 531 (emphasis in original).

## II.

Maryland Rule 2–501(a) provides that, upon motion, the
court shall enter summary judgment "if the motion and re-
sponse show that there is no genuine dispute as to any
material fact and . . . the party in whose favor judgment is
entered is entitled to judgment as a matter of law." The
purpose of summary judgment is not to resolve disputes of
fact. *See Southland Corp. v. Griffith,* 332 Md. 704, 712, 633
A.2d 84 (1993). Rather, the purpose of summary judgment is
to determine whether there exist any disputes of material
facts so as to make a trial necessary. *Nixon v. State,* 96
Md.App. 485, 500, 625 A.2d 404, *cert. denied,* 332 Md. 454, 632
A.2d 151 (1993). If the material facts are undisputed, our task
in reviewing a lower court's summary judgment decision is to
determine whether the court was legally correct. *Baltimore
Gas & Electric Co. v. Lane,* 338 Md. 34, 43, 656 A.2d 307
(1995).

A party moving for summary judgment " 'must include in
the motion the facts necessary to obtain judgment and a
showing that there is no dispute as to any of those facts.' "
*Bond v. NIBCO, Inc.,* 96 Md.App. 127, 136, 623 A.2d 731
(1993), quoting Paul V. Niemeyer & Linda M. Schuett, MARY-
LAND RULES COMMENTARY 330 (2nd ed.1992) (emphasis omit-
ted). If the moving party sets forth sufficient grounds for
summary judgment, the non-moving party, in order to defeat

the motion, must show with some particularity that there is a genuine dispute as to material fact. *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993). "[G]eneral allegations which do not show facts in detail and with precision are insufficient to prevent summary judgment." *Id.* at 738, 625 A.2d 1005. Mere conclusory denials or allegations will not suffice to overcome a motion for summary judgment either. *See Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 243, 603 A.2d 1357 (1992). Furthermore, even if the non-moving party identifies a factual dispute, this showing will not prevent summary judgment unless the dispute concerns a "material" fact, that is, a fact whose resolution will somehow affect the outcome of the case. *Bagwell v. Peninsula Regional Medical Center*, 106 Md.App. 470, 489, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996).

The court, in ruling on the motion, must view the facts and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Baltimore Gas & Electric, supra*, 338 Md. at 43, 656 A.2d 307. If there is any dispute as to a material fact, the motion for summary judgment must be denied. *Fireman's Fund Insurance Co. v. Rairigh*, 59 Md. App. 305, 313, 475 A.2d 509, *cert. denied*, 301 Md. 176, 482 A.2d 502 (1984). In addition, we will not ordinarily affirm a summary judgment on a ground on which the lower court did not rely and on which the lower court would have had discretion to deny summary judgment. *Hoffman v. United Iron and Metal Co., Inc.*, 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

In its memorandum opinion granting the Wests' motion for summary judgment, the circuit court reviewed the conveyances in the Wests' subdivision and listed the title defects. The court stated that the Wests were subjected to the threat of litigation because their Property had no access to a public road, it was burdened by two unreleased liens that the Wests had not created, and "may be burdened by an unrecorded right-of-way" between Dustin's lot and the Peaches' lot. Accordingly, the court concluded that the Property was "unmar-

ketable" and entered summary judgment in favor of the Wests. The court stated: "Given this record, litigation seems quite likely. We find, therefore, that Plaintiffs' title is unmarketable and we will enter summary judgment in favor of Plaintiffs and against [Stewart Title, Land Title, and Goldberg]."

## A.

■ Stewart Title argues vigorously that summary judgment against it was premature because the Wests' litigation against all defendants had not been finally resolved. It bases this contention on Paragraph 7(b) of the Policy, which states:

No claim shall arise or be maintainable under this policy . . . in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, *adverse to the title,* as insured, as provided in paragraph 3 hereof.

(Emphasis supplied.) In support of its position, Stewart Title relies on a treatise by Professor D. Barlow Burke, Jr., an authority on title insurance. *See* D. Barlow Burke, Jr., Law of Title Insurance (2nd ed.1993). While Professor Burke's views are certainly cogent, we believe that his views are not apposite. Therefore, we conclude that the insurer was not entitled to rely on Paragraph 7(b) under the circumstances of this case. We explain.

The Wests filed a multi-party suit, but they did not seek a declaration that their title was good. Instead, they claimed that there were defects in their title for which they sought relief. As it concedes in its reply brief, Stewart Title admitted that the Wests' Property was landlocked. Stewart Title further acknowledged that there was a title defect with respect to the Rowe Road right-of-way.[7]

---

7. At the summary judgment hearing, Stewart Title's counsel stated: "With respect to the right-of-way agreement, there is . . . a problem there. . . . [D]ue to some misdescription in the right-of-way, itself, the property benefits the lot; as you look at the West lot, the property

■ Paragraph 7(b) requires a final determination that is "adverse to the title." The qualifying phrase "adverse to the title" is not superfluous. It indicates that Paragraph 7(b) only applies when the "adverse" nature of the title is in dispute. Conversely, the provision would not apply when, as here, it is conceded that the insured's title is defective, and when there is thus no need for a court determination "adverse to the title." Stewart Title's interpretation to the contrary would have the effect of reading the "adverse to the title" language out of the policy. That construction would conflict with the settled principle that a contract should not be interpreted in a manner that disregards a meaningful part of the agreement. *See Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 782, 625 A.2d 1021 (1993); *Arundel Federal Savings & Loan Association v. Lawrence*, 65 Md.App. 158, 165, 499 A.2d 1298 (1985). Further, to the extent that the contractual language is ambiguous, we follow the rule, adopted from general contract law, that ambiguities in insurance policies are construed against the insurer, because the insurer is the party that drafted the policy. *Mutual Fire, Marine & Inland Insurance Co. v. Vollmer*, 306 Md. 243, 251, 508 A.2d 130 (1986); *Josey v. Allstate Insurance Co.*, 252 Md. 274, 279, 250 A.2d 256 (1969); *Lowitt v. Pearsall Chemical Corp. of Maryland*, 242 Md. 245, 259, 219 A.2d 67 (1966); *Bentz v. Mutual Fire, Marine & Inland Insurance Co.*, 83 Md.App. 524, 531, 575 A.2d 795 (1990).

---

directly to the right of that, which is now owned by the Peaches, I believe."

In addition, in the introduction to the counterclaim and cross-claim that Stewart Title filed on June 15, 1994, it stated, in part:

This is an action by Stewart Title, insurer of title to a parcel of land purchased by the Wests, to reform a right-of-way agreement . . . in order to correct a *mutual mistake* made by the parties to the Right-of–Way Agreement. The Right–of–Way Agreement was intended to provide the Wests with access to their lot from Rowe Road. Due to a *misdescription* in the Right–of–Way Agreement, however, the Right–of–Way Agreement *mistakenly* benefits an adjacent parcel of land owned by the Peaches. This complaint is asserted in order to correct the mutual mistake and reform the Right–of–Way Agreement to conform with the intent of parties.

(Emphasis supplied.)

 In this case, in which the title defects are conceded, we conclude that the Wests do not have to procure a "final determination . . . adverse to the title" in order to recover from appellant. We find persuasive the reasoning of the court in *Endruschat v. American Title Insurance Co.*, 377 So.2d 738 (Fla.Dist.Ct.App.1979). There, the court said that title insurance policy language is "but sophistry" if Paragraph 7(b) is interpreted "to mean that even if the claim is valid, the validity is, at a minimum, postponed if the Company arbitrarily denies coverage and the insured as a result is required to go it alone and file suit to clear or defend the title." *Id.* at 743.

 Stewart Title cites Professor Burke's statement that the presence of Paragraph 7(b) is consistent with the view that title insurance indemnifies against loss, but does not constitute a guaranty of title. Burke, *supra*, § 12.43 at 12:49 to 12:50. But our interpretation of Paragraph 7(b) is not inconsistent with the indemnity nature of a title insurance policy. Once advised of a title problem, the insurer still has the option of paying the insured's loss, clearing the defects within a reasonable time, or showing that the defects do not exist. While the insurer may seek to participate in litigation concerning a title that it agrees is defective, it cannot rely on such litigation to avoid or delay compliance with its contractual obligations.

Stewart Title also quotes the following statement from Professor Burke as to why its liability should be delayed:

[T]he delay is consistent with other clauses in the policy in which an insurer is given a range of options in the policy by which he can clear the disputed title. The insurer needs time to pursue these options, both in order to mitigate the actual loss and to give insurer and insured an opportunity to fulfill their duties of cooperation and fair dealing with one another.

Burke, *supra*, § 12.4.3 at 12:50. Professor Burke's arguments may control when the insurer is defending an insured who is subjected to a title challenge, or the insured (or the insurer on his behalf) claims that title is good and pursues an action to establish that fact. Certainly, the insurer needs an opportuni-

ty to pursue the litigation to its conclusion in order to attempt to establish the insured's title. But in this case, there is no dispute as to the defective nature of the Wests' title. Moreover, Professor Burke's argument does not address the fact that Paragraph 7(b) requires not simply any "final determination," but instead only a final determination "adverse to the title."

Finally, Stewart Title quotes Professor Burke's justification for Paragraph 7(b) that "the outcome of litigation is often uncertain and damages are speculative until the outcome is clear." Burke, *supra*, § 12.4.3 at 12:50. This may be true, but in the context of this case, it is irrelevant. The outcome of the litigation with respect to whether the Wests' title is defective is not "uncertain," because Stewart Title admits the existence of title defects to the Property.

For these reasons, we conclude that the insurer may not use Paragraph 7(b) as a shield to delay its liability when it admits the defective nature of the insured's title. Instead, Paragraph 7(b) only applies in cases in which either (1) the insured, or the insurer on behalf of the insured, files suit claiming that the insured's title is good, or (2) a third party sues the insured claiming that the insured's title is defective. When, as here, both the insurer and the insured concede the existence of defects in the insured's title, litigation to final judgment is not a condition precedent to the insured's right to recover from the insurer.

### B.

Stewart Title also argues that the court erred in granting summary judgment because it summarily "resolved genuine disputes of material fact concerning the description of the property conveyed to the Wests and whether that description should or should not have been used in the Policy." Stewart Title bases this argument on the fact that the Wests' deed to the Property erroneously failed to convey either the triangular parcel or the panhandle strip, and the same erroneous Property description was used in the Policy. Therefore,

Stewart Title contends that title defects in the triangular parcel or panhandle strip are not covered by the Policy.

We agree with appellant that, because the triangular parcel and the panhandle strip were not part of the Property that was insured, a failure of title as to those parcels, or title defects with respect to those parcels, are not insured by the Policy.[8] *See Canatella v. Davis*, 264 Md. 190, 206, 286 A.2d 122 (1972) (title insurer not liable when the land conveyed to the purchaser was less in amount than that which he had contracted to purchase, where the description of the land in the policy and land conveyed in the deed were the same). In our view, however, the question of whether Stewart Title is liable under the Policy does not necessarily depend on whether Stewart Title insured the triangular parcel or the panhandle strip. This is because the portion of the Property that *was* insured was entirely landlocked, and the Policy insured against a lack of a right of access. Moreover, property that is completely deprived of a right of access may well be unmarketable, as the court below concluded.

Stewart Title, in a footnote in its reply brief, *admits* that the Property was landlocked, although it denies that this rendered the Property unmarketable. Yet there are few title problems that are more palpable than complete lack of access to a public road. When property completely lacks such access, it is usually held that its title is unmarketable, apparently on the ground that the purchaser would be subjected to the risk of a lawsuit to establish an easement by necessity in order to gain a right of access. *See Regan v. Lanze*, 40 N.Y.2d 475, 387 N.Y.S.2d 79, 354 N.E.2d 818 (1976). " 'A marketable title

8. The parties have not apprised us that a Property description was included in a binder issued for settlement. If such a binder was issued, we do not know if the Property description conflicted with the Property description in the Policy. Thus, that issue is not before us. In addition, our discussion does not address whether the parties intended a different Property description in the Policy or whether the Policy should be reformed to rectify a "scrivener's error." Nor do we express any opinion concerning the merits of any claim the Wests may have with respect to the omission of these parcels from the description of Property covered by the Policy.

is one which is free from encumbrances and any reasonable doubt as to its validity and such that a reasonably intelligent person, who is well informed as to the facts and their legal bearing, and who is ready and willing to perform his contract, would be willing to accept in the exercise of ordinary business prudence.' " *Myerberg, Sawyer & Rue v. Agee*, 51 Md.App. 711, 716, 446 A.2d 69 (1982), quoting *Berlin v. Caplan*, 211 Md. 333, 343–44, 127 A.2d 512 (1956). Moreover, the Policy makes the lack of a right of access a separate and independent ground of recovery. Thus, since it is undisputed that the Property was landlocked as of the date the Policy was issued, there was an insured title problem, even if the triangular parcel and panhandle strip were not covered by the Policy.

From its analysis of the Property's title and access problems, the circuit court concluded, as we noted earlier, that the Property was "unmarketable." In concluding that the Property was unmarketable, the court seemed to consider only the Property that *was* insured by the Policy, *i.e.*, the land that the Wests contracted to purchase, minus the triangular parcel and the panhandle strip. The court reasoned that the Property was unmarketable because: (1) the Wests' Property lacked access to a public road; (2) it was "burdened by two liens"; and (3) it was possibly burdened by an unrecorded right-of-way between Dustin's lot and the Peaches' lot.

The court did not mention the triangular parcel in its "Conclusions." While the court observed that the Wests "may or may not be benefitted by a right of way to Springdale Road," its reference to access to Springdale Road was made in the context of its finding that the Property insured by the Policy lacked access to a public road.[9] Therefore, even though a failure of title as to the triangular parcel or the triangular strip, and title defects with respect to those parcels, are not

---

**9.** Some two years after entering summary judgment, the court awarded the Wests $2,000.00 in damages for the value of the triangular parcel. The court did not explain why it made that award, and we shall not speculate as to its reasons. Moreover, given our decision to vacate summary judgment, we need not consider whether the court erred in making this award.

insured by the Policy because the parcels were not included in the Policy's property description, the circuit court correctly considered only the Property that *was* insured by the Policy.

**C.**

Nevertheless, we conclude, on another ground, that the court erred in granting summary judgment. As we have observed, the court's decision was based on its conclusion that the Property was unmarketable. We have no quarrel with the circuit court's ability to decide the title's marketability in a summary judgment proceeding, because the marketability of title is a question of law for the court. *Berlin v. Caplan,* 211 Md. 333, 341, 127 A.2d 512 (1956); *Fraidin v. State,* 85 Md.App. 231, 248, 583 A.2d 1065, *cert. denied,* 322 Md. 614, 589 A.2d 57 (1991). The issue of marketability, however, is not dispositive of liability in this case. Rather, the issue is whether Stewart Title *breached* the Policy. As we stated earlier, the mere existence of title defects does not, in and of itself, mean that a title insurer is in breach of the insurance policy, any more than the event of a fire means that the policy insuring against such loss has thereby been breached.

Appellant argues that the court did not determine the question of breach in its opinion granting summary judgment. We agree. In our review of the court's opinion, it appears that the court concluded only that, due to the various title defects, the Property was unmarketable. After concluding that the Property was unmarketable, the court would have had to determine whether there were disputed, material facts concerning Stewart Title's compliance with its contractual obligations. In particular, the court would have had to consider whether Stewart Title paid the Wests' loss or cleared the defects within a reasonable time after receipt of notification of the defects.

At the time of the summary judgment proceeding, Stewart Title conceded that the Property was landlocked. It is also undisputed that the insurer had not paid the Wests' loss and

that all of the defects had not been cleared. The proper focus, therefore, is whether a reasonable time had elapsed since Stewart Title was informed of the defects.

We recognize that, at the hearing on appellant's motion to alter or amend the judgment, almost two years after the entry of summary judgment, the court commented that Stewart Title had "breached" its contract because it had neither paid the Wests' loss nor cleared the defects after receiving notice of them. But the appropriate time for this analysis was when the court entered summary judgment, not at a hearing on a separate matter almost two years later. Moreover, the question was not simply whether Stewart Title had failed to cure the title defects. Instead, the question is whether, *as a matter of law,* the insurer failed to do so *within a reasonable time* after notice. What is a "reasonable time" is ordinarily a question of fact, *see Lynx, Inc. v. Ordnance Products, Inc.,* 273 Md. 1, 13, 327 A.2d 502 (1974), and is usually not a matter that is appropriate for resolution on summary judgment.

Accordingly, we hold that the circuit court erred in granting summary judgment in favor of the Wests. We caution, however, that our opinion should not be construed to suggest that the Wests are not entitled to recover from Stewart Title. On remand, the court should determine whether the Wests' Property, as covered by the Policy, had, at the time the Policy was issued,[10] any of the title problems insured by the Policy. While the court may rely on its previous determination that the Property was unmarketable and on Stewart Title's admission that the Property was landlocked, it may also decide to re-examine this issue. If the court finds that there existed covered defects on the date the Policy was issued, it should then consider (a) whether Stewart Title paid for the Wests' loss within a reasonable time,[11] or (b) whether Stewart Title

---

10. The Policy insures against defects "as of Date of Policy."

11. Paragraph 5 of the Policy, which governs the payment and settlement of claims, is silent as to the time by which the insurer must pay a claim. Under Maryland law, when a contract does not contain an express provision as to when performance is due, a reasonable time is

cured the problems within a reasonable time after receipt of notice of them. If appellant did neither of those, then it breached the Policy.

Because of our decision to vacate the summary judgment, we decline to consider Stewart Title's various contentions that the circuit court improperly calculated the Wests' damages.

### III.

Stewart Title also contends that the judgment against it must be vacated because the Wests failed to join their mortgage lender, Margaretten, which was a necessary party to the circuit court proceedings. We shall address this issue for the guidance of the court on remand.

Rule 2–211(a) governs necessary parties. It provides, in pertinent part:

Except as otherwise provided by law, a person who is subject to service of process shall be joined as a party in the action if in the person's absence

(1) complete relief cannot be accorded among those already parties, or

(2) disposition of the action may impair or impede the person's ability to protect a claimed interest relating to the subject of the action or may leave persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations by reason of the person's claimed interest.

Stewart Title bases its argument on the "noncumulative liability" provision contained in Paragraph 9 of the Wests' Policy. According to appellant, any payment to the Wests under their Policy reduces dollar-for-dollar the amount of insurance available to Margaretten under its lender's policy. Therefore, appellant argues that disposition of the current

implied. *Anne Arundel County v. Crofton Corp.,* 286 Md. 666, 673, 410 A.2d 228 (1980); *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 617, 112 A.2d 901 (1955); *USEMCO, Inc. v. Marbro, Inc.,* 60 Md.App. 351, 365, 483 A.2d 88 (1984).

action "impair[ed] or impede[d]" Margaretten's "ability to protect a claimed interest relating to the subject of the action," so that Margaretten is a necessary party under Rule 2–211(a).

Paragraph 9 of the Wests' Policy states:

**LIABILITY NONCUMULATIVE**

It is expressly understood that the amount of insurance *under this policy* shall be reduced by any amount the Company may pay under any policy insuring either (a) a mortgage shown or referred to in Schedule B hereof which is a lien on the estate or interest covered by the policy, or (b) a mortgage hereafter executed by an insured which is a charge or lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy. The Company shall have the option to apply to the payment of any such mortgages any amount that otherwise would be payable hereunder to the insured owner of the estate or interest covered by this policy and the amount so paid shall be deemed a payment under this policy to said insured owner.

(Emphasis supplied.)

This provision does not reduce the amount of coverage on Margaretten's lender's policy by the amount paid to the Wests under their Policy. Instead, it only reduces the amount of coverage on the *Wests' Policy* by any amount paid to a mortgagee, such as Margaretten, under a lender's policy. Therefore, on the basis of Paragraph 9 of the Wests' Policy, Margaretten is not a necessary party. Nor has Stewart Title pointed us to any provision in Margaretten's policy that renders it a necessary party.[12]

**SUMMARY JUDGMENT VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**

---

12. Our discussion, of course, does not prevent Stewart Title from arguing on remand that Margaretten is a necessary party on the basis of a provision in its policy or on any other basis.